UNITED STATES of America and Needham Gray Joyner, Jr., Revenue Agent of the Internal Revenue Service, Petitioners-Appellees,

v.

Gordon H. THOMPSON, Respondent-Appellant.

No. 81–5759.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1982.

Decided March 11, 1983.

Rehearing Denied June 7, 1983.

Clifton Peter Rose (argued), Lead Counsel, Williams & Jensen, Washington, D.C., John M.L. Brown, Nashville, Tenn., for respondent-appellant.

Joe B. Brown, U.S. Atty., Aaron Wyckoff, Nashville, Tenn., John F. Murray (Lead Counsel), Michael L. Paup, George L. Hastings, Jr. (argued), U.S. Dept. of Justice, Tax Div., for petitioners-appellees.

Before ENGEL and CONTIE, Circuit Judges, and JOHNSTONE,* District Judge.

ENGEL, Circuit Judge.

Gordon H. Thompson appeals from a district court order enforcing an Internal Revenue Service ("IRS" or "the government") summons issued pursuant to 26 U.S.C. § 7602(2). The sole issue is whether the IRS additionally was obliged to follow the "John Doe" procedures of 26 U.S.C. § 7609(f) in order to obtain the names of members of Thompson's barter exchange. Upon the facts before the district court, we conclude that it was necessary to follow these procedures.

We restate the facts essentially as set forth in the government's brief. Thompson and two other individuals are the partners in Barter Systems of Nashville (BSN), a so-called "barter exchange." A barter exchange operates as a clearinghouse for the trade of goods and services among its members. For a $50.00 initiation fee and $300.00 annual dues, BSN issues each member an account number and embossed card similar to a credit card. A member wishing to purchase particular goods or services may call the exchange for referral to another member interested in providing the de-

* Honorable Edward Johnstone, United States District Court Judge for the Western District of Kentucky, sitting by designation.

sired goods or services. When the purchasing member obtains the goods or service, he or she signs an authorization much like a standard credit card purchase form. A copy of that form is mailed to BSN, which then records the transaction, crediting the account of the selling member for the amount of the purchase while charging it against the buyer's account. The seller may then use his credits to obtain goods and services from other members of the exchange. The buyer, in turn, is expected to provide goods or services to other members in the amount of charges against his account. Thus in the usual transaction, no cash changes hands. BSN records each day's trades on daily transaction sheets which contain the name of the buyer and seller and the amount and nature of the transaction. These in turn are incorporated in monthly transaction sheets which do not reflect the name of the particular buyer or seller.

In recent years, the IRS has become aware of the existence of barter exchanges and has concluded that the noncash nature of barter transactions warrants investigation to determine whether income from these transactions is being correctly reported. Therefore, the IRS instituted a "Barter Exchange Project Unreported Income Program" in 1979. According to the Internal Revenue Manual Supplement, 45G–324, March 11, 1980, the purpose of the project was "to identify and to select returns in need of examination that are associated with organized barter exchanges, including the returns of barter exchanges, owners and operators, and members of such exchanges." [1]

In May 1980, the IRS assigned Revenue Agent Needham Gray Joyner, Jr., to conduct an audit of Barter Systems of Nashville to determine the correct income of Barter Systems for the years 1978 and 1979 and the correct income tax liability of its partners.[2] The file assigned to Joyner indi-

1. Section 2.01 of the Supplement outlines the background of the project:

> The growth of the number of organized barter exchanges, their franchise activity, and the number of members have resulted in widespread publicity concerning the advantages of noncash transactions. Such transactions represent a potentially significant area of noncompliance.

The Supplement thereafter instructs agents concerning the method of locating barter exchanges (section 3); the selection, examination, and reporting procedures (section 4); audit techniques for organized barter exchanges (section 5); and audit techniques for members (section 6). Finally, with respect to the use of the summons, section 7 of the Supplement provides as follows:

> Section 7. Summons Use
> .01 Voluntary cooperation by barter or trade exchanges and their members should be solicited before consideration is given to issuing a summons.
> .02 If voluntary cooperation is not obtained, identities of other members of the exchange and the details of their transactions should be secured using the Service's authority under Sections 7601 and 7602.
> 1 If the operator of the exchange declines to furnish the identities of participants and details of their transactions, a John Doe summons should be issued after consultation with District Counsel. The provision of Section 7609(f) of the Internal Revenue Code

must be met before a John Doe Summons is issued.
2 If returns of participants are under examination and they cannot, or will not, furnish copies of monthly statements or other evidence to document their volume of bartering, consider issuing a specific summons to the barter or trade exchange.

Manual Supplement 45G–324, Dept. of Treasury, IRS (March 11, 1980).

2. Plaintiff Revenue Agent Needham Gray Joyner, Jr., testified that one of BSN's partners stated in the press that the exchange was conducting approximately $1 million in trade each month. App. 32–33. His testimony before the district judge indicated that this sum "does not match up with the per return of approximately gross sales of around $140,000." App. 33. The government brief asserts that BSN reported gross income on its federal income tax report of approximately $140,000 even though the comments to the press would indicate a gross income in excess of $1.2 million. No returns were made a part of the record, at least on this appeal. Agent Joyner in response to the question "and they reported $140,000 worth of income?" answered: "$140,000." *Id.* It thus is not entirely clear whether in fact the $140,000 was the income of BSN or was the adjusted gross income which each of the three partners received from BSN, which would not necessarily be entirely inconsistent with the trades which Mr. Brady had referred to in the newspaper. We assume, however, for the purposes of

cated, both by color coding and by an attached memorandum, that the partnership information return and the three taxpayers' returns had been selected for audit through the Barter Exchange Project. During the course of the investigation, Thompson agreed to provide Joyner with BSN's monthly transaction sheets but refused to produce the daily transaction sheets, taking the position that he had an obligation to BSN's members not to disclose their names without requiring that the IRS first proceed under the "John Doe" summons provisions of section 7609(f). Accordingly, Joyner issued an Internal Revenue summons to Thompson under section 7602 requiring him to produce "all daily transaction sheets recording trades between Barter System members for the years 1978 and 1979."[3] When Thompson refused to comply with the ordinary administrative summons, the IRS instituted this enforcement petition.

In the proceedings before the district court, the government asserted that the summons was issued for the purpose of determining the correct tax liabilities of BSN's partners and that access to the daily transaction sheets was necessary to determine those liabilities. While Thompson offered to produce copies of the daily transaction sheets with the names of the customers deleted, Joyner testified that the sheets in their original form were required. He explained that he could not complete his audit without them since the only audit techniques available to verify income would be to ask a sample of the members to verify the information contained on the transaction sheets.

Both Joyner and Robert C. Hissam, IRS Nashville District project coordinator for the Barter Exchange Project, testified that

this opinion that the government had a legitimate purpose for the issuance of the summons insofar as it had a good faith intent to audit the BSN partnership's income for the years 1978 and 1979.

**3.** The IRS had conducted an earlier audit of BSN's 1976 and 1977 tax reports, according to Thompson, which resulted in no adjustment in partnership income. In the earlier audit, the IRS did not seek the names of BSN's members.

the names of the members obtained through Joyner's audit would also be used as a basis to determine whether and how many audits of the exchange members would be conducted. Joyner insisted, however, that the use of the names was only a "secondary purpose" while the "primary purpose" of the summons was to investigate BSN. The district court accepted the position of the government and entered an order enforcing the summons after making the following oral findings:

THE COURT: Thank you. I am going to grant the petition to enforce the summons. It seems to me that there is a legitimate purpose to order up the Barter Systems, congressionally authorized purpose that's relevant to the audit, that the original entry documents are necessary for the audit, and I would agree with counsel for Mr. Thompson of Barter Systems that this information is obviously going to be used in the barter project.

I think it's also entirely possible that the audit itself is the result of a barter project and that there is that secondary purpose of using the information for the barter project as well as for the audit, but I am going to grant the petition to enforce.

This appeal followed.

At issue is the applicability under these circumstances of the special procedures of section 7609(f). Congress enacted section 7609(f) in the Tax Reform Act of 1976, Pub.L. No. 94–455, § 1205(a), 90 Stat. 1520, in response to a Supreme Court decision upholding IRS use of "John Doe" summonses. *United States v. Bisceglia,* 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975).[4] Section 7609(f) provides:

The returns for all years were prepared by a firm of qualified certified public accountants.

**4.** In *Bisceglia,* the Court upheld IRS authority to issue a "John Doe" administrative summons to a bank officer in order to identify an unknown depositor of 400 deteriorated $100 bills. Section 7602 authorized summoning of "any person" relevant to a revenue investigation. From this, the Court concluded that the only protections the statute afforded from arbitrary or capricious action were the federal courts.

(f) Additional requirement in the case of a John Doe summons.—Any summons described in subsection (c) which does not identify the person with respect to whose liability the summons is issued may be served only after a court proceeding in which the Secretary establishes that—

(1) The summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination of the records (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

■ Thompson's major contention on appeal is that the IRS summons is not enforceable because the administrative steps required by section 7609(f) have not been followed.[5] The position of the IRS is rather straightforward. In order to obtain enforcement of a summons, the IRS contends that it need only make a *prima facie* showing that the summons was issued for a proper purpose, that the material summoned is relevant to that purpose, that any administrative steps required by the Internal Revenue Code have been followed, and that the material sought by the summons is not in the government's possession. These are the essential requirements of *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). The

government correctly states that once the government makes an initial showing of compliance with these requirements, the burden rests with the taxpayer to challenge the summons and to satisfy the court that "substantial deficiencies in the summons proceeding" exist. *United States v. Newman,* 441 F.2d 165, 169 (5th Cir.1971). Where the government's logic goes awry, however, is in its assumption that once a legitimate purpose is shown to investigate the taxpayer summoned, its impact upon third parties is invariably immaterial. In essence the government argues that where the "primary purpose" is to investigate the record keeper, it is excused from any further compliance with *Powell's* final requirement that "the administrative steps required by the Code [be] followed." *Powell,* 379 U.S. at 58, 85 S.Ct. at 255.

Since this investigation arose as a part of the Barter Exchange Project, the "institutional posture" of the IRS as well as the "personal intent" of the agents was to target the members of the BSN, once identified through the summons process, as well as Thompson.[6] *See generally United States v. LaSalle National Bank,* 437 U.S. 298, 316, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978). Agents Needham and Hissam admitted as much at the hearing, and it is repeatedly acknowledged in the IRS's brief and arguments.[7] It is equally unquestioned that this intent existed at the time issuance of the subpoena was sought and was not merely formed after issuance of the subpoena or as an incidental effect of the resulting investigation. Under these circumstances, we be-

420 U.S. at 151, 95 S.Ct. at 921. Congress was unwilling to leave this broad summons power to the untrammelled discretion of administrative personnel and therefore added section 7609(f). *See In re Tax Liability of John Does,* 671 F.2d 977 (6th Cir.1982).

5. Thompson also argues that the IRS has failed to prove that the summons was issued for a legitimate purpose. We accept, however, the claim of the Service and the finding of the district judge that the IRS did in fact intend to audit BSN and that the information sought was reasonably necessary for and relevant to the audit of BSN's partners. *See* note 2, *supra.*

6. The BSN partnership is not a taxpayer under the Internal Revenue Code although it is a reporting entity.

7. For example, the IRS brief acknowledges:

Finally, Joyner and Robert C. Hissam, Internal Revenue Service, Nashville District project coordinator for the Barter Exchange Project, both testified that the names of the members obtained through Joyner's audit would also be used as the basis to determine whether and how many audits of the exchange members would be conducted.

Appellee's brief at 6.

lieve that the literal language of the Code triggers the operation of the special procedures set forth in section 7609(f) and that it is immaterial that the primary purpose may have been to audit BSN. For authority we need look no further than the precise language and plan of the Code itself and, particularly, of section 7609(f).

The question posed by section 7609(f) is not, as we see it, whether the investigation of BSN itself was legitimate or pretextual. We assume that the government's motives pass muster in all regards and thus assume that all of the requirements of case law in this respect have been met. However, when the undisputed facts show that at the time of issuance it is also an intent of the IRS to discover the identity of an ascertainable group of persons whose potential liability is at issue, the John Doe summons procedure must be followed with respect to the service of the summons. In other words, Congress inquired: who is the "person with respect to whose liability the summons is issued"? The IRS here gives a dual response: BSN's partners and an unascertained but ascertainable class, the members of BSN.

A further flaw in the IRS's reasoning is the inference that there are two distinct types of administrative summonses—one issued pursuant to section 7602, and another issued pursuant to section 7609. This argument simply ignores the structure of the Code and the interrelationship of those two sections. We believe our unwillingness to accept this characterization of section 7609 marks our point of departure from the rationale the Eighth Circuit recently employed in arriving at a different result under similar circumstances. *United States v. Barter Systems, Inc.,* 694 F.2d 163 (8th Cir. 1982).[8] The reference in section 7609(f) to "any summons described in subsection (c)" directly refers to summonses issued under paragraph 2 of section 7602, precisely the type of summons issued to Gordon Thompson.[9] The proofs establish that, in addition to BSN's partners, the members of the barter exchange are "person[s] with respect to whose liability the summons is issued." The summons does not identify those persons and in fact seeks to do so. Therefore, the IRS is required to show that: (1) the summons relates to the investigation of a particular person or group, (2) there is a

---

8. The Eighth Circuit apparently views a summons under section 7609(f) as distinct and separate from the ordinary section 7602 administrative summons. That court observed: "The statute [section 7609(f)] ... does not apply to the summons issued here, since the summons did identify the person with respect to whose liability the summons was issued, namely, [the barter exchange], and therefore was not a John Doe summons." *United States v. Barter Systems, Inc.,* 694 F.2d at 168 (8th Cir.1982). The identification of a known taxpayer (e.g., the record keeper) on a summons is not dispositive. We do not believe that the IRS can avoid the requirements of section 7609(f) merely by identifying the record keeper as a person with respect to whose liability the summons is issued. Nor do we believe that even a legitimate investigation of a record keeper's own tax liability can be used to exempt the IRS from following section 7609(f) procedures when at the time of its issuance a summons in fact also pertains to the liability of other unidentified persons. To hold otherwise would present the IRS with an irresistible invitation to avoid the clear Congressional safeguards of section 7609(f).

9. Section 7609(c) provides:
   (c) Summons to which section applies.—

(1) In general.—Except as provided in paragraph (2), a summons is described in this subsection if it is issued under paragraph (2) of section 7602 or under section 6420(e)(2), 6421(f)(2), 6424(d)(2), or 6427(h)(2) and requires the production of records.
(2) Exceptions.—A summons shall not be treated as described in this subsection if—
(A) it is solely to determine the identity of any person having a numbered account (or similar arrangement) with a bank or other institution described in subsection (a)(3)(A), or
(B) it is in aid of the collection of—
(i) the liability of any person against whom an assessment has been made or judgment rendered, or
(ii) the liability at law or in equity of any transferee or fiduciary of any person referred to in clause (i).
(3) Records; certain related testimony.—For purposes of this section—
(A) the term "records" includes books, papers, or other data, and
(B) a summons requiring the giving of testimony relating to records shall be treated as a summons requiring the production of such records.

reasonable basis for believing that this person or group may fail or has failed to comply with the provisions of the internal revenue laws, and (3) the information sought is not readily available from other sources. 26 U.S.C. § 7609(f); *In re Tax Liability of John Does*, 671 F.2d 977 (6th Cir.1982). Thus, in a most literal sense the language of 7609(f) is triggered here. This is recognized by the IRS in its own manual. Manual Supplement 45G–324, Dept. of Treasury, IRS (March 11, 1980), section 7.02(1), *see* note 1 *supra.*

The statutory language of section 7609(f) is totally consistent with the legislative history of the Tax Reform Act of 1976. In stating the general reasons for the addition of section 7609, the House Committee which drafted the Act noted that while "[t]he use of the administrative summons ... is a necessary tool in conducting many legitimate investigations ... [, its use] should not unreasonably infringe upon the civil rights of taxpayers including the right of privacy." H.R.Rep. No. 94–658, 94th Cong., 2d Sess. 307, *reprinted in* [1976] U.S.Code Cong. & Ad.News 2897, 3203. After discussing the then existing John Doe practices upheld in *United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975), the Committee reported its belief that "recent changes, while commendable, do not fully provide all the safeguards which might be desirable in terms of protecting the right of privacy." H.R.Rep. No. 94–658, 94th Cong., 2d Sess. 307, *reprinted in* [1976] U.S.Code Cong. & Ad News 3203. Adequate safeguards require that the parties to whom the records pertain be advised of the third party summons. The House Report observed, however, that:

> In the case of a John Doe summons, advance notice to the taxpayer is obviously not possible. Here the committee decided that the IRS agent should be required to show adequate grounds for serving the summons in an independent review process before a court before any such summons can be served.

*Id.* The remainder of the House Report fully supports the language of subsection 7609(f) and compels the application given here.[10]

The IRS claims that the result we reach here cannot be squared with the Supreme Court's decision in *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), and that Court's concern that summons enforcement provisions not be construed in a manner which "would unwarrantedly cast doubt upon and stultify the [Internal Revenue] Services' every investigatory move." *Id.* at 531, 91 S.Ct. at 542. Congress was, however, sensitive to the commands of *Donaldson* and made it clear that the committee did not intend to impose an undue burden on the Service such as, for example, requiring a showing of "probable cause" to believe that a criminal act would occur or that even civil fraud had taken place or might be involved. It was for this reason that Congress adopted the relatively low threshold test of § 7609(f)(1), (2) and (3). *See* H.R.Rep. 94–658, 94th Cong., 2d Sess. 311–12, *reprinted in* [1976] U.S.Code Cong. & Ad.News 3207–8.

Finally, the burden imposed upon the IRS by Congress is not arduous, particularly in light of the construction placed upon section 7609(f) by our circuit in *In re Tax Liabilities of John Does, supra.* It should also be noted that our decision here only applies where it is shown that there exists a clear intent to investigate unknown third parties at the time the summons is issued. Thus this case may be distinguished from other situations where there may not be such an established institutional purpose or where the agent investigating a record keeper issues a summons unaware of the existence of a project establishing such an institutional purpose. Nor would it necessarily apply merely due to a remote possibility that in the course of the investigation of a record keeper some further information might be discovered leading to investigations of then unidentified taxpayers. Such is not the sit-

---

**10.** The legislative history of the section is well chronicled in our recent decision in *In re Tax* *Liability of John Does*, 671 F.2d 977 (6th Cir. 1982).

uation here where the intention was well formed before the summons was issued and the summons was issued pursuant to a project under which the unidentified taxpayers were clearly a target. In such circumstances, we do not believe it is necessary or even desirable that the issue be decided upon the purely subjective intent of any individual agent as to whether the investigation of such unknown persons was a "primary" or "secondary" purpose of the issuance of the summons. It is enough that the intent was a motivating factor in the issuance of the summons in the first place.

Reversed and remanded for further proceedings consistent with this opinion.