NEIL K. BAKER AND JUDY BAKER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 10121-84. Filed May 18, 1987.

*R. La Mar Bishop* and *Thomas A. Collins*, for the petitioners.
*Thomas N. Thompson*, for the respondent.

SWIFT, *Judge*: In a statutory notice of deficiency dated January 17, 1984, respondent determined deficiencies in petitioners' Federal income tax liabilities for 1976 through 1979 as follows:

| Year | Deficiency |
|------|-----------|
| 1976 | $913 |
| 1977 | 581 |
| 1978 | 4,298 |
| 1979 | 2,851 |

These deficiencies arise from respondent's disallowance of a net operating loss reported on petitioners' 1981 joint Federal income tax return. After concessions, the primary issue for decision is the proper value of trade units received

by petitioner Neil K. Baker as the owner of a barter exchange.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in Reno, Nevada, at the time their petition was filed. Petitioners timely filed joint Federal income tax returns for the years in issue. Hereinafter "petitioner" will refer only to Neil K. Baker.

Petitioner is the sole proprietor of a barter exchange business using the name of Exchange Enterprises of Reno (the exchange). The exchange is a licensee of Exchange Enterprises, Inc., a Utah corporation, which is a nationwide licensor of the barter exchange concept and of the methods of doing business used by petitioner. Petitioner's license encompasses the metropolitan Reno, Nevada, area.

The exchange operates as a clearinghouse for the barter of goods and services between members of the exchange. The exchange enlists individuals and businesses to become members of the exchange, informs members of the goods and services available for barter, authorizes specific barter transactions, and maintains records of trade units earned and spent by each member on barter transactions. For a $25 membership fee and a $125 annual fee (both to be paid in cash), individuals and businesses can become members of the exchange and thereby become entitled to buy or sell goods and services through the exchange to other members of the exchange.

In a typical barter transaction occurring between members of the exchange, a member notifies the exchange that he would like to acquire certain goods or services. The exchange refers him to a member of the exchange who is a seller of the requested goods or services. The potential buyer and seller negotiate a price. Once a price has been agreed to, the buyer contacts the exchange to obtain authorization for the transaction. If the exchange ascertains that the buyer has sufficient trade units in his account to pay for the goods or services, the exchange authorizes the transaction and issues a purchase order number to the

buyer. The goods are transferred by the seller to the buyer, or the services are performed by the seller for the buyer.

Rather than receive goods or services as consideration in the barter transaction, the seller receives trade units in an amount equivalent to the agreed-upon sales price. The exchange credits the seller's account at the exchange with the appropriate number of trade units, and the buyer's account at the exchange is debited with the same number of trade units. The buyer's account also is debited with the number of trade units equivalent to a 10-percent commission. The trade units representing the commission are credited to the account of the exchange itself.

A credit balance in a member's trade unit account at the exchange represents trade units that that member is entitled to spend. A debit or negative balance in a member's trade unit account indicates that the member has purchased goods and services with a value in excess of the value of goods or services he has sold. A member with such a negative balance is responsible, at some later point in time, to provide other members of the exchange goods or services with a value up to the amount of his negative balance.

To illustrate further the specifics of a typical transaction, the following actual transaction was described at the trial. The exchange, as part of its marketing efforts, enlisted a ski resort in Utah to become a member of the exchange. The ski resort offered to barter to other members of the exchange ski lift tickets for a price of $9 each, which was the usual retail price for an all-day adult lift ticket. No part-day, child, or otherwise-reduced lift tickets were offered by the ski resort for purchase through the exchange.

A member of the exchange purchased six of the lift tickets, and 54 trade units (6 × $9) were credited to the account of the ski resort. The account of the buyer was debited with 59.40 trade units, consisting of the $54 price of the lift tickets and the 5.40 trade units representing petitioner's commission. Thereafter, the ski resort and petitioner would be able to use the trade units credited to their accounts in this transaction (54 and 5.40 trade units, respectively) to buy goods or services offered for barter through the exchange.

In theory, in the above transaction, the buyer (as a result of prior barter transactions as a seller of goods or services through the exchange) would have a credit balance in his trade unit account, and the 59.40 debit to his account would simply reduce his credit balance by that number of trade units. If, however, the transaction was approved by the exchange when the buyer had a negative balance in his trade unit account or when he did not have a sufficient credit balance to cover the full 59.40 trade unit cost of the transaction, the buyer's account at the exchange still would be debited the full 59.40 trade units due on the transaction, producing (or increasing) a negative balance in his account.

Where a member of the exchange had a negative balance in his account, he was to issue to the exchange a promissory note in favor of the exchange reflecting the full amount of the negative balance. Under the terms of the exemplary promissory note included in the exchange's operations manual, a member required to issue a promissory note because of a negative balance in his trade unit account was obligated to pay into the exchange within one year (through the sale of goods or services) sufficient trade units to eliminate his negative trade unit account balance. If he failed to do so, under the terms of the promissory note the exchange would have the legal right to sue the member for a monetary judgment and to recover $1 for each negative trade unit in his account.

State and local sales taxes that were due on particular barter exchange transactions sometimes were charged by the exchange in trade units to the buyer. For example, where sales taxes were charged to the buyer in a transaction involving 100 trade units with respect to which a 4-percent sales tax liability existed, the buyer's account with the exchange would be debited four trade units, in addition to the trade units debited to his account for the purchase price and the commission. It appears from the exhibits in evidence, however, that sales taxes often were not charged to the buyer in trade units, nor were they collected from the buyer in cash. The record also is not clear in those transactions where sales taxes were charged to buyers, how (or even whether) the exchange actually paid the sales taxes to State and local taxing authorities.

According to the membership agreement and the operations manual, members of the exchange were required to sell or barter merchandise at prices that reflected "prevailing" prices, and members were precluded from overcharging. Most of the invoices that are in evidence herein (reflecting actual transactions between members of the exchange in 1981) do not indicate whether the sales prices set forth on the invoices are reflected in dollars or trade units. On those invoices, however, where the amount of the sales price is reflected in dollars, the exact same number (in some cases with sales taxes and freight added) of trade units was charged to the purchaser (i.e., one trade unit was treated as equivalent to $1).

As we interpret the membership agreement, the operations manual, the invoices, and the other facts mentioned above, the clear intent of the national licensor and of petitioner was that the prices at which goods and services were to be bartered within the exchange were to be based on the usual retail prices therefor, and one trade unit was to be treated as $1. Thus, if the retail price of a ski lift ticket was $9, a member of the exchange was not to sell the lift ticket to another member of the exchange for more than nine trade units.

The following schedule indicates how certain exchange invoices in the record herein reflect purchase prices in both dollars and trade units (one trade unit being equivalent to $1):

| Item | Sales price | Sales taxes and/or freight | Trade units charged to members |
|---|---|---|---|
| 6 Ski tickets | 6 × $9.00 | - - - | 54.00 |
| 100 Silver dollars | $3,000.00 | $105.00 | 3,105.00 |
| 2 Silver bars | 2,800.00 | - - - | 2,800.00 |
| 4 Tires | 483.80 | 27.82 | 511.62 |
| 3 Floor mats | 178.50 | - - - | 178.50 |
| 3 Floor mats | 292.50 | - - - | 292.50 |
| Attache cases | 2,067.96 | 149.33 | 2,217.29 |
| Veterinary services | 72.50 | - - - | 72.50 |
| Stereo merchandise | 198.00 | 6.93 | 204.93 |
| Passport photos | 80.00 | 2.80 | 82.80 |
| Janitorial services | 165.00 | - - - | 165.00 |
| "Sweatpea" | 33.50 | - - - | 33.50 |
| Muzak services | 115.50 | - - - | 115.50 |
| Muzak services | 114.00 | - - - | 114.00 |

| Item | Sales price | Sales taxes and/or freight | Trade units charged to members |
|------|------------|---------------------------|-------------------------------|
| Muzak services | $90.00 | --- | 90.00 |
| Muzak services | 105.00 | --- | 105.00 |
| Muzak services | 84.00 | --- | 84.00 |
| Veterinary services | 37.50 | --- | 37.50 |
| Computer paper | 1,940.00 | $169.48 | 2,109.48 |

The facts relating to another particular transaction are illuminating. A safe was purchased by a member of the exchange for a price of $378.50. One-half of the purchase price was paid by the buyer in cash (namely, $189.25). The other one-half of the purchase price was paid in trade units (namely, 189.25 trade units), again equating one trade unit with $1.

Petitioner organized the exchange in 1975. By 1981, there were approximately 400 individuals or businesses that had paid the membership fee and had become members of the exchange. During 1981, approximately 7,000 separate barter exchange transactions occurred between members of the exchange.

In addition to the individuals and businesses that were members of the exchange, approximately 40 other barter exchanges (located in other cities that also were licensed with Exchange Enterprises, Inc.) became members of petitioner's Reno-based barter exchange. Members of petitioner's exchange therefore could enter into barter transactions with individuals and businesses that were members of the other barter exchanges that had joined petitioner's exchange.

The operations manual petitioner received from Exchange Enterprises, Inc., recommends that every barter exchange limit the number of members that are allowed to join any one exchange from the same trade or business. For example, the manual suggests that no more than two accountants, one architect, one artist, three auto body repair shops, two bakeries, five electricians, three florists, and one insurance agent be allowed to join the same barter exchange.

Petitioner earned 82,706.73 trade units in 1981 as commissions on barter transactions, and trade units in that amount were credited to the exchange's trade unit account.

At tax time, however, and only for income tax purposes, petitioner reduced by 50 percent the amount or value of the trade units the exchange received as commissions in 1981. Thus, on petitioner's and his wife's joint Federal income tax return for 1981, petitioner reported the 82,706.73 trade units received in 1981 as representing $41,353.37 of commission income.

During 1981, petitioner paid certain business expenses with trade units. On the 1981 joint Federal income tax return, petitioner also reduced by 50 percent the amount of the tax deduction claimed for the business expenses paid with trade units.

Also, on petitioner's 1981 joint Federal income tax return prepared on the cash method of accounting, petitioner claimed a bad debt deduction in the amount of $16,931 with respect to the negative balances existing at the end of 1981 in the trade unit accounts of some of the members of the exchange, namely, in the account of one John Bryner whose yearend negative balance was 15,658 trade units, and in the accounts of certain other members whose cumulative yearend negative balance was 2,545 trade units. In computing the bad debt deduction, petitioner treated the 15,658 negative trade units of John Bryner as equivalent to $15,658, and petitioner treated the 2,545 negative trade units of the other members as subject to a 50-percent reduction, or as equivalent to $1,272.

On audit, respondent treated the trade units petitioner received as commissions and the trade units petitioner transferred to others in payment of business expenses as having a value of $1 each. Respondent also disallowed the entire $16,931 claimed as a bad debt deduction.

## OPINION

Gross income includes the fair market value of property received in payment for goods and services. Sec. 61(a);[1] sec. 1.61-2(d)(1), Income Tax Regs. The amount of commission income received by petitioner in 1981, therefore, is to be determined on the basis of the fair market value of the trade units petitioner received as commissions in 1981. This

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

apparently is the first case involving the valuation, for Federal income tax purposes, of trade units received by members of an organized barter exchange.[2] Our recent opinion in *Rooney v. Commissioner*, 88 T.C. 523 (1987), involved accountants who, on an ad hoc basis, agreed to accept goods and services in payment of delinquent accounts. We held that in valuing the goods and services received by the accountants, an objective standard was to be used. We stated that—

section 61 requires an objective measure of fair market value. * * * Under such standard, [taxpayers] may not adjust the acknowledged retail price of the goods and services received merely because they decide among themselves that such goods and services were overpriced. [*Rooney v. Commissioner, supra* at 8-9.]

In *Koons v. United States*, 315 F.2d 542 (9th Cir. 1963), an employee received household moving services in partial payment for accepting a job at a new location. The Ninth Circuit in *Koons* rejected the argument that the amount of income charged to the employee with respect to the moving services should be measured on the basis of a subjective valuation thereof by the taxpayer. The Ninth Circuit stated that—

the use of any such [subjective] measure of value as is suggested is contrary to the usual way of valuing either services or property, and would make the administration of the tax laws in this area depend upon a knowledge by the Commissioner of the state of mind of the individual taxpayer. We do not think that tax administration should be based upon anything so whimsical. * * * We think that sound administration of the tax laws requires that there be as nearly objective a measure of the value of services that are includible in income as possible, and the only such objective measure * * * is fair market value. * * * [315 F.2d at 545.]

In the context of summons enforcement proceedings, a number of courts have accepted as reasonable respondent's contention that barter exchange transactions create circumstances that are conducive to improper tax avoidance. *United States v. Pittsburgh Trade Exchange, Inc.*, 644 F.2d 302, 306 (3d Cir. 1981); *Korpi v. United States*, an unreported case (D. Mass. 1984, 84-1 USTC par. 9203 at 83,344 n. 1, 53 AFTR 2d 84-1048 n. 1); *United States v. Island*

---

[2] *Wright v. Commissioner*, T.C. Memo. 1984-287, involved the question of when a taxpayer is to recognize income on the receipt of trade units in barter transactions. No issue was presented to the Court in that case, however, as to the value of trade units.

*Trade Exchange, Inc.*, 535 F. Supp. 993, 996-997 (E.D. N.Y. 1982).[3] We share that concern.

In 1982, Congress expanded the return reporting requirements of section 6045 to make barter exchanges, among other organizations, subject thereto. Sec. 311 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 600-601.[4] The purpose of this change in section 6045 was to improve compliance with respect to the reporting of taxable transactions conducted through barter exchanges. S. Rept. 97-494, at 246 (1982). Thus, it appears that Congress also has recognized the potential for tax avoidance inherent in barter exchange transactions.

The absence of the use of currency and the tax reduction motives suggested in literature of the exchange[5] suggest to us that the operations of the exchange and the tax effect of transactions occurring within the exchange deserve close scrutiny. The above factors also further support the adoption, for tax purposes, of an objective test for the valuation of trade units received by petitioner and by members of the exchange.

---

[3]See also *United States v. Gottlieb*, 712 F.2d 1363, 1364-1365 (11th Cir. 1983); *United States v. Thompson*, 701 F.2d 1175, 1176 (6th Cir. 1983); *Matter of Does*, 671 F.2d 977, 978, 980 (6th Cir. 1982); *United States v. Barter Systems, Inc.*, 574 F. Supp. 1, 2 (D. Neb. 1981), revd. on another issue 694 F.2d 163 (8th Cir. 1982); *United States v. Maxwell*, an unreported case (D. Nev. 1981, 47 AFTR 2d 81-1527, 81-1530, 81-1 USTC par. 9378 at 87,028).

[4]Sec. 6045, as amended in 1982, provides in relevant part as follows:

SEC. 6045(a). GENERAL RULE.—Every person doing business as a broker shall, when required by the Secretary, make a return, in accordance with such regulations as the Secretary may prescribe, showing the name and address of each customer, with such details regarding gross proceeds and such other information as the Secretary may by forms or regulations require with respect to such business.

 \* \* \* \* \* \* \*

(c) DEFINITIONS.—For purposes of this section—
 (1) BROKER.—The term "broker" includes—
 (A) a dealer,
 (B) a barter exchange, and
 (C) any other person who (for a consideration) regularly acts as a middleman with respect to property or services.

Treasury regulations issued under sec. 6045, as amended in 1982, set forth specific reporting requirements for barter exchanges and make those reporting requirements effective for transactions occurring on or after July 1, 1983. Sec. 1.6045-1(e) and (f), Income Tax Regs., T.D. 7873, 1983-1 C.B. 307, 313-314.

[5]A mailing sent to all members of the Exchange contains the following misleading statement concerning the income tax treatment of barter exchange transactions:

"Where all credits of income are used to purchase goods or services directly related to the business of the individual, there is no need to determine what relation the credit has to the dollar—credits of expense offset the credits of income. In this case, there is no income tax consequence at all."

Adopting such an objective standard herein for Federal income tax purposes, we conclude that the value of each trade unit received as a commission by petitioner in 1981 was $1. Numerous facts in evidence fully support this conclusion. Trade units often were treated by the exchange and its members as equivalent to dollars—i.e., one trade unit was equated with $1. Although some members negotiated the price of a transaction in terms of trade units, others negotiated the price in terms of dollars, and such transactions were then treated as involving an equivalent number of trade units. A transaction negotiated for $100 generally was treated as representing 100 trade units.

Only for income tax purposes did petitioner make any adjustment to the value of trade units. On the books of the exchange, no adjustment was ever made to the value of trade units, nor did petitioner notify members of the exchange of a reduction in the value of trade units. State and local taxes were computed on the basis of a value for the trade units of $1 each.

We emphasize that the membership agreement and the operations manual specify that no goods or services are to be sold within the exchange above prevailing retail prices. Also, promissory notes to be obtained from members with negative account balances were to be paid off first in trade units and then in an equivalent number of dollars. Implicit in the documentation referred to is the fact that the retail prices to be reflected in barter exchange transactions are to reflect a ratio of dollars to trade units of one-to-one.

We also note that petitioner himself, with respect to the bad debt deduction claimed on his 1981 joint Federal income tax return, treated the negative trade units owed by Jim Bryner as having a value of $1 each.

Petitioner argues that in spite of the restrictions on overpricing, exchange members often inflated the prices of goods and services sold on the exchange and that members could not take advantage of sales and discount prices in obtaining goods and services on the exchange. Petitioner contends that these facts justify a discount in the valuation of trade units for tax purposes.

We do not dispute that some members may have inflated the prices at which they bartered goods and services on the

exchange and that certain discount prices may not have been available in barter transactions. Those facts, however, do not alter the value of a trade unit. At most, those facts simply reflect characteristics of a barter exchange resulting in certain price adjustments and are no different in principle from the higher prices one typically pays for goods and services in a department store, as compared to the prices paid for the same goods and services in a discount store. Such occasional and subjective differences in price certainly do not justify a reduction for tax purposes in the value of the medium of exchange—whether they be dollars or trade units.

The limited availability of many goods and services on the exchange appears, in part, to be attributable to the manner in which the exchange was operated. As explained, in any one community the number of merchants in a particular trade or profession who were allowed to join the exchange was to be restricted. Thus, the limited availability of goods and services on the exchange, at least in part, was a built-in feature of the exchange so that there would be more buyers than sellers of particular goods and services and does not justify a reduction in the value of trade units for tax purposes.

For the reasons stated above, we conclude that for Federal income tax purposes the value of trade units petitioner received as commissions was $1 each.

Petitioner, alternatively, claims a bad debt deduction, an ordinary loss deduction, or an ordinary business expense deduction, with respect to trade units owed to the exchange at the end of 1981 by members who had terminated their membership in the exchange (i.e., the negative trade unit balances of terminated members). Aside from other grounds on which this deduction could be disallowed, we disallow the claimed bad debt deduction because petitioner has not established that the purported debt was wholly or even partially worthless as of the end of 1981. Sec. 166(a). We disallow the claimed ordinary loss deduction because petitioner has not established that he had no reasonable prospect of recovery of the purported loss. Sec. 1.165-1(d)(2)(i), Income Tax Regs. We disallow the claimed ordinary and necessary business expense deduction because

petitioner did not incur any actual expenses with respect to the negative trade units as of the end of 1981. Sec. 162(a).

Petitioner is a cash basis taxpayer. He may be correct that in a subsequent year he personally will be required to add trade units to the barter exchange accounting system to make up for the negative trade unit account balances of terminating members. Any tax deduction claimed by him with respect thereto (if not disallowable on other grounds) must await that event.

*Decision will be entered under Rule 155.*