EXCHANGE ENTERPRISES OF SALT LAKE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Exchange Enterprises of Salt Lake, Inc. v. Commissioner
Docket No. 4552-85.
United States Tax Court
T.C. Memo 1987-414; 1987 Tax Ct. Memo LEXIS 411; 54 T.C.M. (CCH) 213; T.C.M. (RIA) 87414; August 24, 1987. R. La Mar Bishop, for the petitioner. *412 David L. Miller, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated November 28, 1984, determined a $ 23,881 income tax deficiency for petitioner's taxable year ended September 30, 1981. After concessions, the central issue for our consideration is whether petitioner, a barter exchange, acquires a basis or has an ownership interest in members' trade units so as to be entitled to: (a) Deduct, as a bad debt, uncollectible negative balances in inactive members' barter trade unit accounts; or (b) deduct, as an ordinary and necessary expense, the negative balances of inactive members' barter trade units. A second issue involves whether petitioner is entitled to deduct, as a "conversion" loss, the difference between either the value or face amount of its own trade units and a lesser amount of cash received in exchange for the trade units. FINDINGS OF FACT Petitioner, Exchange Enterprises of Salt Lake, Inc. (Exchange) was a Utah corporation with its principal place of business in Sale Lake City, Utah, both at the time of the filing of its petition and during the taxable *413 year in issue. [1] Exchange's books were maintained and its income and expenses reported pursuant to the accrual method of accounting. Ross Rigby was the president and majority shareholder of Exchange. Exchange was a licensee of Exchange Enterprises, Inc., a Utah corporation which designed a barter leasing contract or a licensing agreement allowing independent barter brokerage companies in various cities to use the name "Exchange Enterprises" and provided an operations manual and other aids to the operation of a barter exchange. Exchange operated as a central clearing house or brokerage for members and it maintained a list of members and the types of goods and services available from each member for trade to other members. Only members were entitled to use the services of Exchange. Members were required to pay an initial membership fee of $ 25 and annual dues of $ 125. [2] Members could buy or sell goods or services to or from other members only by using trade units (sometimes referred to as barter credits), instead of cash, as the medium of exchange. Exchange maintained the *414 members' accounts on the basis of trade units and recorded trade units "earned" and "spent" by members. Exchange maintained two separate sets of records. Exchange's general ledger contained its balance sheet and profit and loss accounts. In addition, Exchange maintained a subsidiary-type ledger of members' accounts reflecting the credit or debit balances of each member. The members' accounts ledger did not have a direct corresponding control account in Exchange's set of general ledger accounts. [3] Trade units, for internal accounting and bookkeeping of members; accounts, were assigned a one dollar "valuation" (face value). [4]
*415 New members advised Exchange of the types of goods and services they had available. Pursuant to the operating manual, the exchange operator should attempt to seek out different members with varying goods and services to avoid duplication and provide variety. The vast majority of goods traded were new and many of the members were retailers. The members agreement required goods and services to be exchanged at the provider-member's prevailing price (full retail price). [5] Each time a member's goods or services were traded to another member, their account was increased (credited) by the number of trade units negotiated between the members. Likewise, the account of a member who received the goods or services was reduced (debited) by the number of trade units negotiated. The recipient's (buyer) account was also reduced (debited) by an additional ten percent of the trade units paid (price), which constitutes a commission and was credited to Exchange's trading account. All transactions between members were required to be cleared or approved in advance by Exchange which issued a "purchase number." The provider (seller) of the goods and services was required to submit documents to Exchange, *416 signed by the recipient (buyer), within seven days of the transaction to insure that the accounts were properly credited and debited. Exchange did not take physical possession of goods that were exchanged between members. The rules and regulations and a sample Membership Agreement Contract are attached hereto as Appendix A. If a member wished to "purchase" an item but did not have sufficient trade units, Exchange would frequently authorize the purchase and debit the member's account for the negotiated number of trade units and the ten-percent commission, even if a deficit or negative (debit) balance resulted. [6] At the time a member's ledger account became negative, Exchange did not transfer trade units from any account to make up or balance the negative balance. Nor did Exchange set up a "loan" account or accounts *417 receivable or payable regarding members' negative balances. Exchange did not obtain promissory notes from members who had negative balances. Although Exchange permitted members to enter into transactions which resulted in or increased negative balances, Exchange made no express guarantee regarding these negative balances at the time the individual transactions were approved. [7]
Exchange, for Federal tax purposes, reported income and expenses based upon barter exchange trade units at 50 percent of face. Accordingly, the income generated by the ten-percent commissions received from buyers was reported at $ 0.50 [8] for each *418 $ 1.00 of trade units reported. [9] For the taxable period in question, Exchange determined that member's net credit balances totaling 35,940 trade units were "dead accounts" (inactive) and this amount was reported in Exchange's income at the 50-percent discount. [10]Exchange also determined that certain members' accounts with net debit balances totaling 84,546.66 trade units were worthless and uncollectible and claimed a deduction against income of the 50-percent discount. Respondent allowed $ 4,500 of the claimed bad debt deduction [11] and disallowed the remaining $ 37,723 as unsubstantiated. [12] At trial, we received petitioner's schedule of the individual accounts that were written off as "bad debts," but the books and records [13] of petitioner did not reflect more than $ 2,576.80 of these accounts with debit balances. Petitioner's witnesses stated that the bad debt accounts were removed from the books after they were written off as bad debts. Attempts were made, mostly after the taxable year in question, to collect on some of the credit balance accounts, but these attempts were apparently not very successful. *419 A $ 16,658 "conversion loss" was claimed on Exchange's income tax return for the taxable year ended September 30, 1981. Exchange used the term "conversion loss" to cover situations where trade units were sold for an amount of cash which was less than the face or internal bookkeeping value of $ 1.00. A common situation where this occurred involved employees who were permitted to convert each $ 1.00 of salary money into $ 2.00 of trade units. [14] Also members who did not have goods or services to sell were permitted to purchase trade units for $ 0.50 cash for each $ 1.00 trade unit. Exchange would claim the 50-percent difference against its income. During the taxable year ended September 30, 1981, Exchange sold 33,316 [15] trade units for $ 16,658 cash. The trade units sold were from those which Exchange had already reported in income for Federal income tax purposes. *420 OPINION The central issue involves whether petitioner is entitled to claim bad debt or business expense deductions under sections 166 or 162[16] for the debit (negative) balances in inactive barter exchange members' accounts. Section 166 permits deductions for partially or wholly worthless debts which become worthless within the taxable year. The amount of the deduction under section 166(b) is the adjusted basis set forth in section 1011. Section 1011 refers us to section 1012 which provides that basis shall be cost. [17]Section 162 allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year. In this context, we must decide whether petitioner either had a basis in the negative balances in inactive members' accounts or whether the existence of such account balances could be considered as "paid or incurred" by petitioner. Petitioner bears the burden of proving it is entitled *421 to a bad debt or business deduction. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner argues that it is the guarantor of the barter system and is responsible for negative balances in inactive accounts, therefore it is entitled to either a bad debt or business expense deduction for the negative account balances of inactive accounts. Respondent argues that petitioner is not a guarantor of the negative balances and that petitioner had no basis in and/or did not "pay or incur" the negative balances of inactive members' accounts. We agree with respondent. To better understand the parties' arguments, we must do so in the context and parlance of the business activity and transactions of petitioner. The essence of a *422 barter transaction is the trading of goods or services without the use of money. [18] The obvious advantage of the use of money lies in its universal acceptability as a standard or medium of exchange. Conversely, simple barter transactions generally lack that universal quality and also lack diversibility. [19] Petitioner's business objectives are to provide a barter marketplace and a medium of exchange which includes diversibility. This was to be accomplished by attracting barter members with different goods and services and by providing a system of barter credits to be used as the medium of exchange. Members of the barter exchange compensated petitioner for its services by means of a one-time membership fee, annual dues and a ten-percent fee (paid in barter credits) on each barter transaction (which was paid by the "buyer"). *423 Each barter exchange member contracted with the exchange and agreed, essentially, to conduct their barter transactions through Exchange by means of barter credits. There was no written or express contractual relationship between Exchange members. Additionally, there was no written or express contract between Exchange and the members as to guarantees of the viability of the barter system. [20] When a member wished to "purchase" goods or services, but had no trade credits in their account, Exchange would usually permit the member to establish and maintain a debit or negative balance in the member's trade account. Members who were permitted to create debit balances did not expressly obligate themselves to "repay" the negative balance in their account. Exchange did not loan its earned trade credits to members with debit balances. Accordingly, the integrity of the trade credit system was lessened by Exchange's permissiveness. When a member's account became sufficiently inactive, Exchange closed out the debit or credit balance to itself, which, in the year in question, resulted in Exchange's claimed deduction. *424 Exchange's arguments seeking a deduction as either a business expense under section 162 or bad debt under section 166 are dependent upon the argument that Exchange was the guarantor of the exchange system. Our determination is a purely factual one, inasmuch as we must determine, under these facts, whether exchange acquired a basis in member accounts or "paid or incurred" a business expense. Exchange contends that it was the guarantor of the barter exchange. We find no evidence of an express or implied guarantee. Exchange was not expressly named as guarantor and took no steps reflecting that it acted as a guarantor. To the contrary, Exchange did not guarantee the value of the trade credits or that goods and services would be available in exchange for the credits. When the debit balances were created, Exchange did not transfer credits from its trading account to cause the member's trade accounts to either balance or to maintain the integrity of the trade credit system. Only after a determination that the member with a debit balance was not going to accumulate sufficient credits to offset the debit balance did Exchange take some action - by writing off the account balance against *425 its income. The act of closing out the credit and debit balances of inactive members' accounts to Exchange's profit and loss accounts is inapposite. The members' trading accounts have no direct relationship to Exchange's books of accounts. The extent that Exchange maintains a member's trading account, it may be listed as an asset on Exchange's books, but the members' accounts are not subsidiary to Exchange's books. The members' accounts represent a separate system which reflect trading balances. Inactive accounts with credit balances are to the benefit of all the members of the barter exchange. Conversely, inactive accounts with debit balances are to the detriment of the all the members of the barter exchange. To the extent that Exchange maintains a trade credit account, Exchange, in the broadest sense, has been benefited or harmed by balances in inactive members' accounts. Exchange's source of income is dependent upon the success or failure of the barter exchange and the existence of debit balances may, ultimately, have some bearing on Exchange's source of revenue, but there is no direct relationship to Exchange's books of accounts. [21] Accordingly, we find that Exchange *426 was not a guarantor of the barter exchange. [22]
Exchange's inclusion in income of credit balances and deduction from income of debit balances *427 of inactive members; accounts does not provide a basis in members' accounts. Moreover, petitioner has failed to show a debtor-creditor relationship with members; that the debt, if any, is a valid and enforceable obligation; and that the amount owed, if any, is fixed and determinable. Section 1.166-1(c), Income Tax Regs.; Lieberfarb v. Commissioner,60 T.C. 350, 353 (1973). Also see Zimmerman v. United States,318 F.2d 611, 612 (9th Cir. 1963). Petitioner is not entitled to a bad debt deduction for failing to show a basis in members' accounts, Oats v. Commissioner,316 F.2d 56, 58 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, and failing to show the existence of a debtor-creditor relationship. Petitioner also failed to prove the purported debts became wholly or partially worthless during the taxable year ended September 30, 1981. Although Exchange was responsible for the overall management of the barter system, it was not a guarantor of the system. The act of closing out the debit and credit balances of members to Exchange's books did not cause Exchange to have "paid or incurred" expenses *428 in operating the barter exchange business. The lack of a transactional relationship between the members' accounts and Exchange's books of accounts renders meaningless the act of closing out the balances. Exchange, in its business capacity, is neither directly enriched by credit balances nor caused detriment by debit balance of other members' trading accounts. If, for example, Exchange took the credit balances from inactive accounts and used them to acquire goods and services, Exchange would be required to report income to the extent it was enriched. Wright v. Commissioner,T.C. Memo. 1984-287. If, on the other hand, Exchange offset debit balances in members' accounts with Exchange's trade credits which had been earned and subjected to Federal tax, deductions may have been available. [23] These postulations are, unfortunately not what occurred, and petitioner is not entitled to a deduction for the debit balances in members' accounts. [24]
*429 Petitioner, during the taxable year ended September 30, 19981, sold 33,316 trade units from its credit balance of trade units (which had been previously subjected to tax and for which petitioner had a basis) for $ 0.50 each. For purposes of this case, the parties have agreed that petitioner's trade units had a value of $ 0.67. The trade units sold had been previously subject to Federal income tax and accordingly, petitioner had a basis in them. Accordingly, petitioner is entitled to deduct $ 5,663.72 as a loss from conversion of its trade units to cash during the taxable year. [25]
To reflect the foregoing, Decision will be entered under Rule 155.
APPENDIX A RULES AND REGULATIONS
A
All purchases are to be charged to
Exchange Enterprises who will issue
monthly statements to all members.
B
All purchases must be credit approved by
the Exchange and have a purchase order
number which protects the seller. This can
be done by telephone Monday through
Friday, 9:00 a.m. -- 12:00 p.m., 1:00-5:00
p.m.
C
Exchange Enterprises will endeavor
whether possible to offer personal
arrangement of purchases for all
members.
D
Permission must be granted by the
Exchange before returning to an account
for additional transaction.
E
All invoices from seller must be submitted
within 7 days from date of sale so proper
credit can be given each member. (All bills
must be signed by buyer.) Failure to do so
will place the responsibility of the bill on the
seller and not on the Exchange and if
accepted could incur a 5% weekly penalty.
F
All disputes will be arbitrated by the
Exchange, whose decision is final as to
debits and credits on accounts in question.
G
A trade credit of 50.00 will be allowed to
members who recommend new accounts
who join Exchange Enterprises.
H
Exchange Enterprises has the right at any
time to check on overpricing. Violation may
subject member to immediate cancellation
of membership.
I
Selling member shall furnish all material,
labor, sales taxes, and other charges
comprising the purchase price of the
merchandise or services sold or furnished
and charge the same to Exchange
Enterprises.
J
Purchases of new members will be limited
to the amount of credit accrued on the
books unless authorized by Exchange
Enterprises.
*430 [SEE ILLUSTRATION IN ORIGINAL] Footnotes
1. Exchange had been operated as a partnership for several years before the taxable year in issue. ↩
2. The annual dues were increased to $ 225 beginning February 1, 1981. ↩
3. Exchange's general ledger accounts were balanced separate and apart from the members' account ledger. Exchange maintained an account in the members' account ledger to which commissions were posted and eventually closed out to a profit and loss general ledger account. The members; account ledger did not balance: (1) Because Exchange allowed some members to "buy" goods or services without corresponding credits in their account, and (2) because Exchange sold trade units to individuals who did not earn the units by "bartering." These practices could result in a debit or negative balance without a corresponding credit and would place the members' account ledger out of balance. ↩
4. For purposes of this case only, the parties have stipulated and agreed that to the extent trade units affect petitioner's tax liability, they are assigned a value of $ 0.67. Accordingly, we are not called upon to determine the value of trade units. Cf. Baker v. Commissioner,88 T.C. 1282, 1292↩ (1987). 5. In seeking out new members, the sales presentation included a promotional claim that members could leverage their dollars in the marketplace. This was conceptually to the accomplished as reflected in the following example: A retailer trading or selling $ 1,000 of retail goods, which may have cost $ 500, thereby acquires $ 1,000 of buying power at a $ 500 cost. ↩
6. Conceptually, the operation manual contemplates members' accumulating trade credits by selling goods and services in order to "purchase" goods and services from others. Further, the operation manual warns of the inherent danger to the exchange concept by allowing "purchasing" without offsetting credits or debit balances in members' trade accounts. ↩
7. Because Exchange was acting as a clearinghouse at this stage of the transaction, it appears that the membership bore the risk that the "negative balance members" would stand behind their debit balances. ↩
8. The parties have stipulated for purposes of this case that petitioner may use $ 0.67 per $ 1.00 in trade units for tax reporting purposes. There is no dispute concerning the valuation of trade units. The parties will be required to recompute the results of this case under Rule 155 of this Court's Rules of Practice and Procedure in any event. ↩
9. For the taxable year ended Sept. 30, 1981, Exchange's gross income was computed as follows: Trade units received as commissions
$ 665,807
Trade units closed to Exchange's
account from "dead" or inactive
member accounts
+ 35,940
Total trade unit income items * $ 691,747
Fifty-percent reduction
x     .50
Total trade unit income items
discounted
$ 345,873
Membership dues and fees
received in cash
153,002
Total
$ 498,875
Less:
Purchase and sales costs
$ 513
Returns and allowances
2,275
2,788
Total
$ 496,087
Plus: Interest income
208
TOTAL GROSS INCOME REPORTED
$ 496,295
* This total is $ 10,000 short if the parties' stipulated numbers are correct. We accept the parties stipulation as being offered to conceptually reflect the composition of petitioner's total gross income. ↩
10. As part of its determination, respondent removed this amount from income consistent with the determination that petitioner is merely a clearinghouse without basis or ownership in the members' accounts. Petitioner has not contested this adjustment. ↩
11. Although respondent allowed a bad debt deduction of $ 4,500 in the statutory notice of deficiency, on brief, respondent argues that petitioner is not entitled to any amount of deduction (including the $ 4,500) for bad debts because petitioner has no basis in the inactive members' debt account balances. Respondent is not seeking an increased deficiency with respect to the $ 4,500 already allowed. ↩
12. Respondent's adjustments in the statutory notice are based on figures rounded to the nearest dollar. ↩
13. Petitioner's records, which were offered into evidence, consisted of the computer print outs of a general ledger and the member's subsidiary-type accounts ledger for the months July, Aug. and Sept. 1981. Only the subsidiary-type ledger account of Jerry Peterson in the amount of $ 2,576.50 was reflected in these books. ↩
14. The record is silent as to whether the employees were paid in trade unit equivalency or paid in cash and then "purchased" trade units at a discount. This factor is significant only if the trade units were not taken from petitioner's trade units which were reported for tax purposes. ↩
15. These figures were rounded to the nearest dollar. The actual amount of conversions shown on petitioner's books as of Sept. 30, 1981, was $ 16,657.75 which would have reflected 33,315.5 actual (unrounded) trade units converted to cash. ↩
16. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year in issue. All rule references are to the Tax Court's Rules of Practice and Procedure. ↩
17. Cost may be adjusted under sec. 1016. The adjustments provided for in sec. 1016 to arrive at "adjusted basis" are not relevant to this discussion. ↩
18. Webster's New World Dictionary (1960). ↩
19. If, for example, a person possessed of a relatively valuable and indivisible property (automobile) wished to barter it for various less valuable goods and services (food, clothing, etc.), it is unlikely that one individual would be able to provide all of the various less valuable goods and services necessary to cause an equal or fair exchange. ↩
20. Exchange did not guarantee that members would be able to "spend" their trade credits or that the trade credits would have value. ↩
21. Exchange's accountant testified that the members' accounts ledger was treated as a subsidiary ledger to Exchange's books and records. In essence, he suggested that the debit and credit balances were treated as accounts receivable and payable of Exchange. This would be the proper treatment if Exchange had taken goods and services on consignment or inventoried the goods and sold them. It would also have been an appropriate accounting approach if Exchange was the guarantor of the members' accounts. We have found, however, that Exchange did not buy or sell goods and services, but provided the exchange through which such activity was accommodated and that Exchange was not a guarantor of the trade units, but merely a bookkeeper and clearinghouse for same. ↩
22. Assuming arguendo that we were to find Exchange to be a guarantor of the barter exchange, the outcome of this case would not have been affected because of the additional finding that no basis had been acquired or amounts paid or incurred in connection with the members' accounts. ↩
23. This hypothesis assumes that Exchange's trade credits were loaned and the debt became worthless or that the trade credits were "paid or incurred" as a business expense, such as in the guarantee of the barter exchange system. ↩
24. Petitioner is likewise not required to report as income the credit balances of members' accounts. Respondent, in the statutory notice, gave petitioner an allowance for the members' credit balances that petitioner had taken into income and that allowance was not disputed by petitioner. ↩
25. The $ 5,663.72 loss is computed by multiplying the 33,316 trade units times $ 0.17 (the difference between amount received $ 0.50 and petitioner's basis $ 0.67, as agreed by parties). ↩