T.C. Memo. 2014-35

UNITED STATES TAX COURT

STEVEN T. WALTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21953-12L.                    Filed February 27, 2014.

Steven T. Waltner, pro se.

<u>Michael W. Lloyd</u>, for respondent.

MEMORANDUM OPINION

BUCH, <u>Judge</u>:  This case began as a collection proceeding in which Steven

Waltner challenged the Internal Revenue Service's efforts to collect a frivolous tax

submissions penalty.  That issue is no longer before us.  On November 23, 2013,

Mr. Waltner mailed full payment of the underlying liability plus interest to the

IRS, thus rendering the issues relating to the collection of that liability moot.

**[\*2]** While the case was pending, however, each party filed a motion asking the Court to impose sanctions against the other under section 6673.[1] But for those motions, the Court could have dismissed this case as moot, and the Court informed the parties of this. Mr. Waltner unconditionally withdrew his motion, but in doing so he restated his view that respondent's conduct merits sanctions and further noted that the Court may impose sanctions on a party sua sponte, implying that the Court should do so notwithstanding that Mr. Waltner had withdrawn his motion. In contrast, respondent was not willing to withdraw his motion. We are left to sort out whether either party should be sanctioned.

## Background

### Mr. Waltner's 2008 Tax Return

In August 2009 Mr. Waltner and his wife, Sarah V. Waltner, submitted a joint Form 1040, U.S. Individual Income Tax Return, for 2008 to the IRS. On the Form 1040 the Waltners reported zero wages, an IRA distribution of over $22,000, a student loan interest deduction, and a home mortgage interest deduction of over $26,000, all of which resulted in zero tax liability. The Waltners each listed their

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] occupation as "private-sector worker", and they claimed a refund of over $10,000.[2]  Along with the Form 1040, Mr. Waltner submitted three Forms 4852, Substitute for Form W-2,[3] (substitute W-2), each reporting zero wages but simultaneously reporting taxes withheld.  Also, each substitute W-2 states that he determined that he received zero wages on the basis of "[p]ersonal knowledge and records provided by the company listed as 'payer' on line 5" and with respect to the efforts he made to obtain a corrected Form W-2, Wage and Tax Statement, he stated "none".  Mr. Waltner also submitted a "correcting" Form 1099-B, Proceeds From Broker and Barter Exchange Transactions, which he altered by inserting the word "corrected" and replacing the amount of gross proceeds of over $5,000 with zero.  At the bottom of the Form 1099-B, Mr. Waltner included the following statement:

> This correcting Form 1099-B is submitted to rebut a document known
> to have been submitted by the party identified above as 'Payer' and
> 'Broker' which erroneously alleged a payment to the party identified
> above as 'Steve T. Waltner' of 'gross proceeds' in connection with a
> 'trade or business.'  Under penalty of perjury, I declare that I have

---

[2]The requested refund included Federal income tax, Social Security tax, and Medicare tax withheld from Mr. Waltner's three jobs and withheld Federal income tax from a retirement plan.

[3]The complete title of this form is "Substitute for Form W-2, Wage and Tax Statement, or Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.".

[*4] examined this statement and to the best of my knowledge and belief, it is true, correct and complete.

The Frivolous Tax Submissions Penalty

Three companies filed Forms W-2 for Mr. Waltner, reporting total wages of over $75,000, and those Forms W-2 also reported taxes withheld consistent with what Mr. Waltner reported on his substitute W-2s. The only substantive difference between the Forms W-2 submitted by the third parties and the substitute W-2s is that Mr. Waltner reported zero wages. In March 2010 the IRS sent the Waltners a letter informing them that the return that they had filed and on which they had reported zero wages represented a frivolous position and offering them 30 days within which to submit a corrected return; otherwise the IRS would impose a $5,000 frivolous submission penalty under section 6702. The Waltners did not submit a corrected return, and respondent assessed a $5,000 penalty and issued to Mr. Waltner a notice of penalty charge, informing him of the assessed penalty.

The Collection Proceeding Before the IRS

Respondent issued a notice of intent to levy to Mr. Waltner to collect the section 6702 penalty. Mr. Waltner requested a hearing and submitted a 49-page fax to the Appeals officer who held the collection due process (CDP) hearing. The

**[*5]** 49-page submission included a summary of Mr. Waltner's position that he is not liable for the section 6702 penalty and a 9-page declaration wherein he states that before January 2008 "I was very ignorant of the tax laws and assumed that all terms used by the IRS had their common meanings and that all earnings were taxable without exception. I have become increasingly more educated regarding these matters and seek to adhere to the rule of law in my affairs with the IRS".

With respect to being liable for the income tax, he declared he was not "an officer, employee, or elected official of the United States, a State or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any one or more of the foregoing", he "was never an officer of a corporation", "did not receive any Wages from any source", "did not work for or receive any pay from an Employer or American Employer", "was not engaged in Employment", "was not an Employee", "was not engaged in Self-Employment", "was not engaged in a Trade or Business, i.e. I have never performed the functions of any public office", "was not a citizen or resident of the District of Columbia or any territory or possession of the United States", was "never incorporated in Washington, D.C. or worked for any company who incorporated in Washington, D.C.", and "was not a governmental unit or agency or instrumentality thereof, or a United States Person".

**[*6]** With respect to the information returns filed by third parties, he stated: "[N]one of the payers for whom I worked in 2008 were engaged in activities effectively connected to a Trade or Business, none was a federal agency, federal instrumentality or federal (or federally-controlled) corporation, and none paid me Wages subject to reporting" however "[s]ome of these payers retained money from my non-Wage pay and paid it over to the IRS as 'withholding' for federal income and employment (payroll) taxes."

During the CDP hearing the Appeals officer informed Mr. Waltner that many of the arguments in his faxed submission were frivolous and that he would not consider them. Mr. Waltner did not provide a Form 433-A, Collection Information Statement,[4] and the Appeals officer was unable to determine whether he was eligible for a collection alternative. Respondent issued a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, sustaining the proposed levy to Mr. Waltner.

The Proceedings Before This Court

Among the errors assigned to respondent in the petition, Mr. Waltner alleged respondent had erroneously determined that Mr. Waltner was subject to a

---

[4]The complete title of this form is "Collection Information Statement for Wage Earners and Self-Employed Individuals".

**[\*7]** section 6702 penalty despite his assertion that he "is not among the class of persons enumerated" in section 6671(b). Further, Mr. Waltner alleged that respondent had failed to verify at the CDP hearing whether Mr. Waltner was "among the limited class of people subject to tax upon which levy by distraint could be made", which he alleged he was not. Mr. Waltner then filed an amended petition from which he omitted those frivolous arguments.

During the five months between the issuance of the notice of trial and the trial date the parties filed 24 motions, some of which were supplemented and many of which required responses, competing requests for admissions and supplemental requests for admissions and various other documents, all of which resulted in the Court's issuing no less than 22 orders. The number of documents filed illustrates the lack of cooperation by the parties and, to some extent, also indicates acrimony between them. Respondent made repeated attempts to elicit overly broad admissions regarding facts and documents related to other years and to nonparties that have no bearing on the year in issue or the penalty at issue in this case. For his part, Mr. Waltner refused to stipulate many relevant facts and objected to being compelled to answer interrogatories and produce documents while he simultaneously requested that the Court compel respondent to answer irrelevant

**[\*8]** interrogatories and produce irrelevant documents.  We address the various filings by category below.

Admissions

Mr. Waltner filed a request for admissions, a supplemental request for admissions, and a motion to review respondent's responses to each.  On November 4, 2013, the Court issued a 39-page order reviewing the 44 requests for admissions and the 83 supplemental requests for admissions and respondent's responses.  The Court found many of Mr. Waltner's requests improper because they called for legal conclusions, posed hypothetical questions, or asked for information not relevant to the frivolous tax submissions penalty for 2008.  The Court also found many of respondent's responses inadequate because respondent attempted to provide documents in lieu of admitting or denying some of the requests, respondent denied for lack of information whether certain exhibits appended to the requests were copies of those in Mr. Waltner's administrative file when respondent presumably had the administrative file to verify those exhibits, and respondent denied for lack of knowledge or information what certain codes in Mr. Waltner's transcript meant when respondent was the one who created those very codes.  The November 4 order directed respondent to file revised responses for

**[\*9]** those the Court found inadequate. On November 22, 2013, respondent filed revised responses conforming to the Court's order.

Respondent filed a 993-page request for admissions, including 242 separate paragraphs and appended exhibits. Mr. Waltner filed a motion for a protective order staying discovery, and respondent filed a notice of objection to Mr. Waltner's motion. By order dated September 5, 2013, the Court granted Mr. Waltner's motion for protective order in part, relieving Mr. Waltner of responding to some requests, and denied the motion in part, requiring him to respond to others. The Court reviewed respondent's requests for admissions and found that some requests were irrelevant to the Court's inquiry (regarding properties sold after the year in issue and information regarding Sarah V. Waltner not related to 2008) and that others related to matters of public record (various District Court, Court of Appeals, State superior court, and the U.S. Court of Federal Claims cases involving the Waltners and criminal court proceedings against Peter and Doreen Hendrickson). Although the Court ordered Mr. Waltner to respond to some of the requests for admissions, when he responded he renewed his objections and failed to admit or deny several requests. And as discussed below, for those requests to which Mr. Waltner responded and denied, some of those denials were not in good faith.

**[*10]** <u>Stipulations</u>

Less than one month after Mr. Waltner's requests for admissions were served, he filed a motion to compel stipulation and for an order to show cause why proposed facts and evidence should not be accepted as established under Rule 91(f). Mr. Waltner alleged that respondent was refusing to stipulate and provided his proposed stipulations. The Court granted Mr. Waltner's motion and issued an order to show cause under Rule 91(f). Respondent filed a response alleging that Mr. Waltner's motion should be denied because Mr. Waltner was refusing to stipulate facts such as his earnings and the CDP administrative file and that many of the proposed stipulations were already covered by Mr. Waltner's requests for admissions. The response also included respondent's responses to Mr. Waltner's proposed stipulations, and so the order to show cause was discharged.

<u>Discovery</u>

Respondent filed a motion to compel responses to interrogatories; however, respondent supplemented his motion when he received Mr. Waltner's responses. Mr. Waltner filed an objection, and because he had in fact responded, we treated respondent's motion to compel as a motion to review the sufficiency of Mr. Waltner's responses. By order dated October 29, 2013, the Court granted respondent's motion and directed Mr. Waltner to supplement his responses

**[*11]** because Mr. Waltner's previous responses consisted of nothing but objections--not a single interrogatory was answered. For example, Mr. Waltner repeatedly objected to interrogatories regarding his earnings from three jobs during 2008 because he stated that they were not reasonably calculated to lead to discovery of admissible evidence regarding the section 6702 penalty. Rather than answer, Mr. Waltner filed a motion for reconsideration of the Court's October 29 order, alleging the Court had exceeded its authority in requiring responses to the interrogatories and not accepting the objections without answers. That motion for reconsideration was denied. Mr. Waltner sought an extension of time within which to answer the interrogatories, and the Court granted his motion. However, he never responded and instead paid the section 6702 penalty as discussed more fully below.

Mr. Waltner filed his own motion to compel responses to interrogatories, which he amended and to which respondent filed an objection. The Court found some of respondent's responses sufficient; however, the Court found four responses to interrogatories regarding the summary record of assessment insufficient. Thus, the Court granted Mr. Waltner's motion in part and ordered respondent to supplement his responses to those four interrogatories. On

**[\*12]** November 22, 2013, respondent supplemented his responses to include sufficient answers to the four interrogatories.

Respondent filed a motion to compel production of documents; however, respondent supplemented his motion when he received Mr. Waltner's response. Mr. Waltner filed an objection; and because he had in fact responded, we treated respondent's motion to compel as a motion to review the sufficiency of Mr. Waltner's response to the request for production of documents. Mr. Waltner's response consisted of nothing but objections--not a single document was produced. The Court reviewed respondent's requests for production and found most of respondent's requests relevant and not objectionable. However, some of respondent's requests were overly broad. For example, respondent requested documents regarding mortgage applications "regardless of year", and so we restricted the request to the two years before and after the year at issue because those might lead to the discovery of admissible evidence. By order dated October 31, 2013, the Court granted respondent's motion in part and ordered Mr. Waltner to supplement his responses. Rather than answer, Mr. Waltner filed a motion for reconsideration of the Court's October 31 order, alleging the Court had exceeded its authority in requiring responses to the requests for production of documents and not accepting the objections without answers. The Court denied that motion

[*13] for reconsideration. Mr. Waltner sought an extension of time to respond to the request for production, and the Court granted that motion. However, Mr. Waltner never responded and, as previously mentioned, paid the section 6702 penalty.

Continuance and Consolidation

Respondent filed the first motion for continuance, requesting that this case be continued so that it may be consolidated with a 2008 deficiency case involving Mr. and Mrs. Waltner's joint return at docket No. 1729-13. Mr. Waltner filed an objection, stating that he did not wish to delay this case and that respondent's motion should be denied because this case concerned only the 2008 penalty. By order dated October 23, 2013, the Court denied respondent's motion to continue because the Court was disinclined to consolidate the two cases, which was the underlying reason for the motion to continue. The Court was disinclined to consolidate the cases because the parties to the two cases are not the same and the issues in the two cases were not the same; more specifically, Mrs. Waltner is not a party to this case but she is a party to the deficiency case, and at that time the underlying issue in this case was whether Mr. Waltner had made a frivolous tax submission whereas the deficiency case will require the Court to determine the Waltners' underlying tax liability. Although it would have been within the sound

**[*14]** discretion of the Court to consolidate the cases, the Court gave heavy weight to the fact that it was Mr. Waltner who opposed consolidation, in part because he represented that he did not want to delay this case.

Notwithstanding Mr. Waltner's statement that he did not wish to delay this case, in early November 2013 he filed his own motion for consolidation of this case with two other cases at docket Nos. 8726-11L and 12722-13. In stark contrast to the consolidation that respondent had suggested, the cases Mr. Waltner proposed to consolidate did not even involve the same years. The Court denied Mr. Waltner's motion to consolidate.

Less than a month before trial Mr. Waltner hired an attorney, who entered an appearance in this case and who filed a motion to change the place of trial to Jacksonville, Florida. At the time of that motion there was no connection in this case to Florida apart from Mr. Waltner's new attorney, whose office was in Florida. The Court denied the motion to change the place of trial because it effectively requested a continuance, and hiring a new counsel is not ordinarily grounds for a continuance under Rule 133. Mr. Waltner's then attorney also filed a motion for reconsideration of the Court's denial of the motion to change the place of trial, which the Court also denied. The Court explained to Mr. Waltner's then attorney that Mr. Waltner had adamantly opposed continuing his trial as

**[\*15]** recently as October 2013. Further, the Court found the motion to change the place of trial was dilatory and appeared "to have been filed solely to accommodate Counsel, who was retained one month before the scheduled trial--a delay of Mr. Waltner's own making." Seven days after Mr. Waltner's attorney filed an entry of appearance, he filed a motion to withdraw as counsel, stating that Mr. Waltner did not object to his withdrawal.

Summary Judgment

Mr. Waltner filed two motions for summary judgment. Each motion stated that there were no genuine issues of material fact because respondent had not proven that Mr. Waltner was liable for the section 6702 penalty. By order dated September 3, 2013, the Court denied Mr. Waltner's first motion for summary judgment. The Court noted that at the time of the September 3 order there was "no evidence in this case; there are only allegations of fact made by the parties * * * thus it appears both parties acknowledge that additional facts remain to be discovered." With respect to Mr. Waltner's assertion in his first motion for summary judgment that he was not a "person" as defined in section 6671(b), we informed him in the September 3 order that this argument has already been

**[\*16]** rejected by this Court and the Court of Appeals to which this case is appealable.[5] Further, we informed Mr. Waltner in the September 3 order that his argument that he was not a person under section 6671was frivolous and warned him that the Court can impose a penalty under section 6673 if it finds that he "instituted or maintained this proceeding primarily for delay or that he took a position that is frivolous or groundless."

Mr. Waltner filed a motion for reconsideration of the order denying his first motion for summary judgment, arguing, among other things, that the Court had misapprehended the meaning of section 6671. Further, Mr. Waltner argued he was entitled to summary judgment, despite the fact that there were disputed facts at the time of the motion. The Court denied that motion for reconsideration. On the same day he filed his motion for reconsideration, Mr. Waltner also filed a motion for certification for interlocutory appeal on the question of interpretation of section 6671(b), which the Court also denied.

Mr. Waltner's second motion for summary judgment incorporated all of his first motion and stated that respondent would be unable to prove that the assessment of the penalty against Mr. Waltner was valid. Mr. Waltner then asked

---

[5]See United States v. Graham, 309 F.2d 210, 212 (9th Cir. 1962); Crites v. Commissioner, T.C. Memo. 2012-267, at \*7-\*8.

[*17] the Court to take judicial notice of a press release regarding "the discovery of evidence of forgery of the proof offered by the sitting President of the United States of his eligibility for office." Mr. Waltner argued that the President cannot be a "competent Executive" and thus there can be no valid delegation of authority from the President to assess the frivolous return penalty at issue. By order dated October 29, 2013, the Court denied Mr. Waltner's second motion.

Fee Waiver

Because we are a Court with nationwide jurisdiction and parties are often far from the Tax Court courthouse in the District of Columbia, the Court will often hold telephone conferences with parties to assist them in resolving issues such as discovery disputes or to discuss motions filed by one or more of the parties. The Court often reviews the case file in whole or in part in preparation for a conference call.

In preparation for such a call, a staff person called the number Mr. Waltner had provided on his petition and requested a convenient time for a conference call and a number where Mr. Waltner preferred to be contacted. During Mr. Waltner's return phone call, he provided a number that he characterized as his work number. The Court observed on Mr. Waltner's fee waiver application that his last "job" was in 2009; the Court then noticed that Mr. Waltner had altered the Court's fee

[*18] waiver form, substituting the word "job" where the original form stated "employment", substituting "pay" for "salary or wages", and substituting "company payer" for "employer". The Court made no findings based on Mr. Waltner's off-the-record statement, but instead by order dated September 6, the Court sought clarification by ordering Mr. Waltner to complete another application for waiver without altering the form; the Court did not direct that Mr. Waltner give updated financial information, only that he complete the form without altering it or provide the same information requested by the form in some other format. In lieu of providing an unaltered form or the requested information, Mr. Waltner paid the filing fee, thus rendering moot the question of whether he was entitled to a fee waiver. As a result, the Court vacated the September 6 order, thus ending the inquiry.

Recusal

After the Court denied Mr. Waltner's first motion for summary judgment and Mr. Waltner paid the filing fee, Mr. Waltner filed a motion for recusal of the Judge assigned to this case. As grounds, Mr. Waltner asserted that the Judge was biased against him because the Court had denied Mr. Waltner's first motion for summary judgment without ordering a response and because the Court had ordered Mr. Waltner to resubmit his application for fee waiver without altering the

[*19] questions or the wording of the form.  Mr. Waltner also claimed that the Court had denied him the ability to appeal the fee waiver issue because the Court had vacated the order calling for a new fee waiver application.  In an order dated October 29, 2013, the Court explained that once Mr. Waltner paid the filing fee, the Court was left with three options:  (1) sanction Mr. Waltner for failing to comply with the Court's September 6 order, which had directed him to submit a new unaltered form or the information requested in the unaltered form, (2) order Mr. Waltner to comply with the September 6 order, or (3) vacate the Court's September 6 order and accept the filing fee.  The option most favorable to Mr. Waltner was to vacate the September 6 order, which is what the Court did.  Because there was no basis upon which bias could be found, the Court denied Mr. Waltner's motion for recusal.

<u>Sanctions</u>

Respondent filed a motion for sanctions pursuant to section 6673 in part on the basis of Mr. Waltner's response to respondent's request for admissions.  That response was filed after the Court's September 3 order, which warned Mr. Waltner about his potential liability for section 6673 penalty.  Respondent alleged that Mr. Waltner had failed to cooperate with respondent to prepare the case for trial and was continuing to assert frivolous positions.  Mr. Waltner filed a response

[*20] objecting to respondent's motion for sanctions, asserting instead that "[r]espondent offers no support (and none exists) for his contention that informing the Secretary on a tax form that one works in the private sector and received little or no reportable income is a 'frivolous' position meriting penalty. This contention is itself frivolous and groundless, resulting in a vexatious multiplication of these proceedings."

Mr. Waltner filed his own motion for sanctions pursuant to section 6673. He stated that he "has no burden to prove that his non-wage earnings were not taxable, nor anything else related to the dollar amounts that were reported as income on his return", all of which he asserted is irrelevant to the frivolous submission penalty. Mr. Waltner also asserted that it is respondent who has multiplied these proceedings by continuing to assert that Mr. Waltner has advanced frivolous arguments and that it is respondent who should be sanctioned.

Motion To Dismiss Petition Without Prejudice

Approximately two weeks before trial Mr. Waltner filed a motion to dismiss his petition without prejudice. Mr. Waltner asserted that his motion should be granted on the ground of mootness because he had fully paid the section 6702 penalty that provided the basis for the proposed collection action at issue. Mr. Waltner attached to his motion a copy of an express mail receipt for a mailing to

**[*21]** the IRS, copies of six money orders totaling $5,400 (each with a handwritten note "2008 1040 CVPN under protest"), and a copy of a note stating "In payment of 2008, 6702 penalty plus interest. This payment is made under protest. This is for penalty assessed on Nov 7, 2011 against Steven T. Waltner. Interest paid as estimated by I.R.S. as of 11-22-13". The Court could not grant Mr. Waltner's motion until it determined that respondent had received the money orders and applied them as Mr. Waltner directed; moreover, the case could not be dismissed while the section 6673 motions remained unresolved. To sort all of this out, the Court set the motion to dismiss for a hearing at the trial session along with the pending section 6673 motions. At the hearing respondent's counsel reported that Mr. Waltner's $5,400 payment had been misapplied but that he would work to correctly apply the payment as Mr. Waltner had directed. On January 14, 2014, respondent filed a status report indicating that Mr. Waltner's $5,400 payment had been found and was in the process of being applied as directed.

December 11, 2013, Hearing

By order dated December 4, 2013, the Court had set both section 6673 motions for hearing and invited each party to appear or file a Rule 50(c) statement addressing whether that party wished to withdraw that party's section 6673 motion in the light of Mr. Waltner's payment of the section 6702 penalty. Each party

**[\*22]** submitted a Rule 50(c) statement; Mr. Waltner unconditionally withdrew his motion for sanctions, but respondent did not. At the hearing the Court also gave both parties an opportunity to reconsider whether they wished to withdraw their section 6673 motions. The Court offered the parties the option of conditionally withdrawing their motions (i.e., "I'll withdraw mine if you withdraw yours."). Mr. Waltner confirmed that he wanted to unconditionally withdraw his motion for sanctions, and respondent confirmed that he wanted the Court to decide his motion.

## Discussion

This case has occupied an inordinate amount of the Court's time. The Court could have disposed of the entire matter summarily by reference to Crain v. Commissioner[6] or any number of other cases that stand for the proposition that we need not address frivolous arguments.[7] After all, Mr. Waltner asserted frivolous

---

[6]Crain v. Commissioner, 737 F.2d 1417, 1417 (5th Cir. 1984) ("We perceive no need to refute these arguments with somber reasoning and copious citation of precedent; to do so might suggest that these arguments have some colorable merit.").

[7]Rapp v. Commissioner, 774 F.2d 932, 936 (9th Cir. 1985); May v. Commissioner, 752 F.2d 1301, 1305-1306 (8th Cir. 1985); Schiff v. Commissioner, 751 F.2d 116, 117 (2d Cir. 1984), aff'g T.C. Memo. 1984-223; Wnuck v. Commissioner, 136 T.C. 498, 499 (2011); McCoy v. Commissioner, 76 T.C. 1027, 1029-1030 (1981), aff'd, 696 F.2d 1234 (9th Cir. 1983); Myrick v.

(continued...)

[*23] arguments, and even after the Court rejected those arguments and warned him about potential sanctions under section 6673, he continued to press those arguments. The Court has taken the time, however, to address those arguments because Mr. Waltner appears to be perpetuating frivolous positions that have been promoted and encouraged by Peter Hendrickson's book Cracking the Code: The Fascinating Truth About Taxation in America (2007). Indeed, it appears not merely that Mr. Waltner's positions are predicated on that book but that his returns and return information have been used to promote the frivolous arguments contained in that book. Consequently, a written opinion is warranted.

Judicial opinions are the "'heart of the common law system'" and serve as "a critical component of what we understand to be the 'law.'"[8] Statutes and regulations provide simply an outline; judicial opinions fill in the details by providing the rule of law the court applied, the court's rationale in applying that law, and the underlying facts.

---

[7](...continued)
United States, 217 F. Supp. 2d 979, 984-985 (D. Ariz. 2002), aff'd, 70 Fed. Appx. 956 (9th Cir. 2003).

[8]Martha J. Dragich, "Will the Federal Courts of Appeals Perish If They Publish? Or Does the Declining Use of Opinions to Explain and Justify Judicial Decisions Pose a Greater Threat?", 44 Am. U. L. Rev. 757, 758 (1995) (citations omitted).

**[\*24]**  Judicial opinions serve many purposes:  they assist attorneys in advising clients and preparing cases; they provide the lower court's rationale when the appellate court must evaluate its decision; they inform the public of the court's analysis; and they establish clear and articulate rules for the future.  It is with these purposes in mind that we address whether Mr. Waltner's conduct merits sanctions while addressing the underlying frivolous positions upon which he relies and which he perpetuates by allowing his return information to be used.

Sanctions

Pursuant to section 6673(a)(1), the Court may impose a penalty of up to $25,000 against a taxpayer when it appears that he or she has instituted or maintained a case primarily for delay, that he or she took a position that is frivolous or groundless, or that he or she unreasonably failed to pursue administrative remedies.[9]  The purpose of section 6673, like that of section 6702 (the frivolous tax submissions penalty that underlies this case), is to encourage taxpayers to conform their positions to settled tax principles.[10]

---

[9]See Pierson v. Commissioner, 115 T.C. 576, 581 (2000).

[10]See Coleman v. Commissioner, 791 F.2d 68, 71 (7th Cir. 1986); see also Wnuck v. Commissioner, 136 T.C. at 513-514; Grunsted v. Commissioner, 136 T.C. 455, 462 (2011).

[*25] One need not review the entire record to determine whether Mr. Waltner should be sanctioned; the answer can be gleaned from the discovery process. In general, a party may seek information in discovery, and the party resisting the discovery may object.[11] Either party may seek the Court's intervention by asking the Court to compel responses or by asking for a protective order.[12] Once the Court rules on the appropriateness of the request or the sufficiency of the answer, however, the parties must comply with the Court's order or risk sanctions.[13]

The discovery disputes are now moot because Mr. Waltner has paid the section 6702 penalty that was at issue. However, each party moved for a section 6673 penalty on the basis of the other's actions. We focus on the record in this case to determine whether either party took a frivolous position after the Court determined it was frivolous or groundless or whether either party took actions primarily for delay.

This case presents clear examples of the proper manner for addressing discovery disputes and of a manner that evidences frivolous positions or attempts at delay. Respondent's counsel sought discovery that went beyond the scope of

---

[11]Rule 90.

[12]Rules 103, 104(b).

[13]See generally Rule 104.

**[*26]** this case, and the Court issued orders excusing Mr. Waltner from responding to those requests. Likewise, respondent's counsel was evasive in answering some of Mr. Waltner's discovery requests, and the Court ordered respondent to supplement those responses. In each instance, once the Court ruled, respondent's counsel cured the defect, through either supplementing his responses or accepting the Court's determinations that his requests were improper.

Mr. Waltner sought to avoid answering every discovery request.

With respect to respondent's interrogatories, the Court found Mr. Waltner's responses (which consisted of nothing but objections) insufficient and ordered him to supplement those responses. As previously discussed, Mr. Waltner repeatedly objected to interrogatories regarding his earnings from three jobs during 2008 because he stated that those interrogatories were not reasonably calculated to lead to the discovery of admissible evidence regarding the section 6702 penalty, an objection that is not in good faith. Rather than supplement, Mr. Waltner filed a motion for reconsideration of the order directing him to supplement, which the Court denied. Mr. Waltner then filed a motion for extension of time to supplement, which the Court granted. However, Mr. Waltner never supplemented his responses.

[*27] With respect to respondent's requests for production of documents, the Court found Mr. Waltner's responses (which again consisted of nothing but objections and did not include a single document) insufficient and ordered him to supplement his responses. Rather than supplement his responses, Mr. Waltner filed a separate motion for reconsideration of the order directing him to supplement his responses, which the Court denied. Mr. Waltner objected to the requests for production regarding his earnings from three jobs during 2008, because he considered that information to be irrelevant--an argument the Court had already rejected. Mr. Waltner then filed a motion for extension of time to supplement, which the Court granted. Just as he never answered the interrogatories, Mr. Waltner never supplemented his responses to the request for production of documents.

Discovery is not the only area in which Mr. Waltner failed to heed the Court's orders. On September 3, 2013, the Court issued an order denying summary judgment and informing Mr. Waltner that he was a person under sections 6671(b) and 7701(a)(1) and thus could be liable for the section 6702 penalty. The Court identified these positions as frivolous in the September 3 order and warned Mr. Waltner that continuing to argue that he was not such a person might lead to the imposition of a section 6673 penalty. After that order, Mr. Waltner repeatedly

[*28] asserted he could not be liable for the section 6702 penalty because he was not among the class of people who can be liable for that penalty:  in his motion for reconsideration of the order denying summary judgment, in his motion for interlocutory appeal, in his motion for recusal, and in his second motion for summary judgment wherein he incorporated his arguments from his first motion for summary judgment.  Also, Mr. Waltner repeatedly alleged that the pay he received for his work in 2008 was not taxable, an argument that was found to be frivolous many years ago.[14]

Mr. Waltner's pattern of filing motions for reconsideration of orders directing him to supplement his responses and then never supplementing those responses shows that those motions were interposed for delay.  Mr. Waltner's objections in the responses he filed were rarely made in good faith.  Mr. Waltner's late attempts to obtain counsel, consolidate this case with other cases, and change the place of trial all show an attempt to delay this case.

---

[14]See, e.g., Coleman v. Commissioner, 791 F.2d at 69 ("Some people believe with great fervor preposterous things that just happen to coincide with their self-interest.  'Tax protesters' have convinced themselves that wages are not income, that only gold is money, that the Sixteenth Amendment is unconstitutional, and so on.  These beliefs all lead--so tax protesters think--to the elimination of their obligation to pay taxes.  The government may not prohibit the holding of these beliefs, but it may penalize people who act on them.").

[*29] One particularly troubling aspect of Mr. Waltner's failure to deal with the Court in good faith relates to requests for admissions. As with the discovery requests, he objected to all requests for admissions that respondent posed. Mr. Waltner sought a protective order, which the Court granted in part and denied in part, ordering Mr. Waltner to respond to the portions of respondent's requests for admissions that the Court found proper. Although the Court determined the remaining requests were proper, Mr. Waltner objected to almost every remaining request as "irrelevant" and "vexatious" and failed to admit or deny several requests notwithstanding the Court's order.

Some of those requests related to the book Cracking the Code. The Court excused Mr. Waltner from admitting or denying that Peter Hendrickson wrote the book Cracking the Code and maintains the Web site www.losthorizons.com, which is repeatedly referenced in the book. The Court did, however, require Mr. Waltner to respond to requests for admissions regarding certain tax materials posted on that Web site that appear to be the Waltners' return information. Mr. Waltner was evasive in his responses and objected to every request related to the Web site on the grounds that they are not relevant to this case and that they are vexatious.

**[*30]** Rule 90(c)(1) generally requires a party to specifically admit, deny, or "assert[] that it cannot be truthfully admitted or denied and set[] forth in detail the reasons why this is so". Mr. Waltner fell far short of this standard. For example, with respect to a request for admission that Mr. Waltner had submitted certain documents[15] to the Web site affiliated with Cracking the Code, he objected to the request, stated he had made reasonable inquiry but he was unable to admit or deny, but that he "[d]enies 'material * * * was contributed by petitioner'". In other requests relating to the Web site, he simply objected and stated he had made reasonable inquiry and was unable to admit or deny. Mr. Waltner never supplemented his answers.

Those responses simply are not credible. Although redacted, even superficially the documents on the Web site appear to be those of the Waltners. The documents still appear on the Web site as of the drafting of this opinion, although after respondent's requests for admissions were submitted they appeared in a slightly more redacted form. But after a more thorough inquiry, it is clear that they are the Waltners' documents; they submitted those same documents in other

---

[15]Specifically, Steven T. Waltner and Sarah V. Waltner's "return information notice" for 2007 from the State of California Franchise Tax Board and a letter from the IRS applying a 2007 overpayment to their outstanding 2006 tax liability.

**[*31]** cases pending in this Court. In short, Mr. Waltner's statements that he was unable to admit or deny the requested admissions do not appear to have been in good faith; they appear to have been an attempt by Mr. Waltner to distance himself from the Web site and its related book.

In short, Mr. Waltner's conduct merits sanctions. His motion to consolidate this case (after having previously objected to consolidation) and his motion to change the place of trial appear to have been interposed primarily for the purpose of delay, and thus his conduct is sanctionable under section 6673(a)(1)(A). Moreover, his assertion of positions that the Court had already rejected as frivolous is conduct sanctionable under section 6673(a)(1)(B). We will address this latter point further.

Mr. Waltner repeatedly advanced frivolous arguments. When he first advanced the argument that he was not a "person" as that term is used in the Internal Revenue Code, the Court explained in an order dated September 3, 2013, that his view has long been rejected. Yet he continued to press that point. His insistence on pressing a point that has been rejected is consistent with an admonition from Cracking the Code: It advises readers to follow its positions

[*32] notwithstanding the consequences.[16]  Indeed, those consequences are often

sanctions on the parties advocating those positions, because courts have repeatedly

rejected the positions espoused in that book.

Cracking the Code

We address the positions set forth in Cracking the Code not only because

some of Mr. Waltner's positions in this case mirror positions set forth in that book,

but also because one of the purposes of the Court's opinions is to guide future

litigants (and in this instance, the same litigant in other proceedings before this

Court).

Simply looking at the materials the Waltners submitted with their 2008

return show that they are familiar with Cracking the Code.  Mr. Waltner has

adopted the book's nomenclature, declaring himself a "private-sector worker" on

his 2008 return, and he followed the author's directions in submitting substitute

W-2s and 1099s including declarations, and reporting his Federal tax withholdings

as including Social Security and Medicare taxes.

In his filings with this Court, Mr. Waltner has adopted the book's frivolous

approach to statutory construction, specifically as it relates to the use of the word

---

[16]Peter Eric Hendrickson, Cracking the Code:  The Fascinating Truth About
Taxation in America 204 (2007).

**[*33]** "includes" when asserting that he cannot be among the class of people subject to a section 6702 penalty. Mr. Waltner altered his request for waiver of the filing fee to be consistent with Cracking the Code, replacing the word "employment" with "job", replacing the words "salary or wages" with "pay", and replacing "employer" with "company payer". Mr. Waltner submitted a 49-page fax that he also submitted to the Appeals officer wherein his declaration closely tracks the narrow types of payments and payers that Cracking the Code declares are taxable and subject to reporting, and wherein Mr. Waltner declares under penalty of perjury that he received no such payments from any such payer. Further, Mr. Waltner states repeatedly in his filings that, although he received pay for working in 2008, the amount he received was not income because it was from a private-sector company, which Cracking the Code declares to be not taxable.

<u>About the Author</u>

When taxpayers consider relying on a book that purports to explain the tax laws, it is reasonable to inquire into the qualifications of the author. After all, the quality of tax research depends on the sources on which the researcher relies. Taxpayers can perform their own research or they can rely on the advice of others

**[\*34]** as a way to avoid the imposition of accuracy-related penalties.[17]  But

whether relying on their own research or relying on others, that reliance must be

reasonable.[18]  For example, if a case is off-topic or is no longer relevant because

the law has changed, relying on that case is not reasonable.[19]  When a taxpayer is

relying on the advice of a tax professional, the Court will consider the

qualifications of the adviser.[20]  So it only follows that, when taking positions

based on a book, it is reasonable to inquire into the expertise of the author.  Some

authors are well-recognized tax experts who are cited by courts; others are not.

Cracking the Code is written by Peter Eric Hendrickson.  Nowhere in his

book does Mr. Hendrickson set forth his credentials, other than on the back cover

where he vaguely identifies himself as "researcher, analyst and scholar".  Add to

that felon and serial tax evader.

---

[17]See, e.g., sec. 6664(c); sec. 1.6664-4(b)(1), Income Tax Regs.

[18]Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

[19]Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.; see also Brown v. Commissioner, T.C. Memo. 2013-275, at \*18.

[20]See sec. 1.6664-4(c), Income Tax Regs.; see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005); Neonatology Assocs, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

**[\*35]** Mr. Hendrickson's first felony indictment of which the Court is aware occurred in 1991.[21] In October of that year, Mr. Hendrickson was charged with:

- Conspiracy to Place Incendiary Device in United States Mail
- Placing Injurious Article in U.S. Mail, Aiding and Abetting
- Malicious Destruction of Property Affecting Interstate Commerce by Means of Explosive
- Use of Explosive to Commit Felony Against the United States
- Failure to File Federal Income Tax Return (relating to 1988)
- Failure to File Federal Income Tax Return (relating to 1989)

Although the descriptions of the first four counts do not appear to be tax related, the indictment provides further insights.

> It was a part of the conspiracy that defendants PETER HENDRICKSON and DOREEN WRIGHT planned the placement of an incendiary device in the mail receptacle on the last day for the filing of federal income tax returns, April 16, 1990, in order to destroy such returns and to foster opposition to the payment of such income taxes.

That device was, in fact, placed in the mail.

> On April 16, 1990, the last day which tax returns could be postmarked that year, a firebomb was placed in a bin at the United States Post Office in Royal Oak, Michigan. At about eight p.m., a postal worker standing near the bin and collecting mail from individuals driving in front of the post office noticed smoke coming from one of the bins. He rummaged through the bin and retrieved a smoking brown padded envelope, addressed "to the tax thieves" from "freedom loving Americans." When the postal worker tried to extinguish whatever was causing the smoke by placing it in a puddle

---

[21]See United States v. Hendrickson, No. 91-80930 (E.D. Mich. Oct. 24, 1991) (indictment).

**[*36]** of water and stomping on it, the bomb detonated, injuring the postal worker and a bystander.

*      *      *      *      *      *      *

Hendrickson and Wright were charged with conspiracy to place the device at the post office. * * *[22]

Ultimately, Mr. Hendrickson pleaded guilty to a two-count superseding information:  Conspiracy to Place Incendiary Device in U.S. Mail and Failure to File Federal Income Tax Return.[23]

Mr. Hendrickson's second indictment occurred in 2008, when he was indicted on 10 counts of filing a false document, 4 relating to Forms 1040 and 6 relating to substitute W-2s.  This indictment is notable because it post-dates the first printing of Cracking the Code, which according to the copyright page of the book occurred in July 2003.  Further, it is notable because part of Mr. Hendrickson's defense appears to have been predicated on "his interpretation of

---

[22]United States v. Scarborough, 43 F.3d 1021, 1023 (6th Cir. 1994).

[23]See Hendrickson, No. 91-80930 (Judgment entered May 13, 1992).  The superseding information and the docket sheet worded the first count as "Conspiracy to Possess a Destructive Device".

**[*37]** the Internal Revenue Code as expounded in his book, Cracking the Code:

The Fascinating Truth About Taxation in America."[24]

In his 2008 criminal case, Mr. Hendrickson advocated the same unduly

narrow--indeed, wholly unreasonable--definition of "person" that he advocates in

Cracking the Code and that Mr. Waltner asserted repeatedly in this proceeding. It

was soundly rejected.

> Defendant begins by asserting that Congress intended through the
> enactment of § 7343 to "limit the application of the title-wide
> definition of 'person' found at 26 U.S.C. § 7701(a)(1)." He then
> argues that the use of the term "includes" in § 7343 is meant to
> provide illustrative examples of a "general class" of "persons" within
> the scope of this statutory definition. Because ordinary individuals
> do not fit within the "general class" described by § 7343 - a class that
> is typified by corporate officers and employees, as well as members
> and employees of partnerships -- Defendant surmises that such
> individuals cannot be deemed "persons" within the meaning of §
> 7343 (and hence under § 7206(1)).
>
> This attempt at statutory construction fails at its initial premise.
> While Defendant states as <u>ipse dixit</u> that it is "unambiguously clear"
> and "immediately apparent" that § 7343 is intended to limit, and not
> supplement, the definition of "person" set forth at § 7701(a)(1), the
> most natural reading of these two definitions suggests otherwise.
> Under its plain terms, the definition of "person" set forth at §
> 7701(a)(1) governs throughout the tax code unless another provision
> "distinctly expresse[s]" otherwise or this definition would be
> "manifestly incompatible with the intent" of a code provision.
> Nothing in § 7343 can be construed as a "distinct[] express[ion]" of

---

[24]<u>United States v. Hendrickson</u>, 664 F. Supp. 2d 793, 796 (E.D. Mich. 2009).

**[*38]** an intent to override or supplant the § 7701(a)(1) definition of a "person." To the contrary, § 7343 reads quite naturally as a supplement to or clarification of this latter definition: § 7701(a)(1) provides that the term "person" "mean[s] and include[s] an individual, a trust, estate, partnership, association, company or corporation," and § 7343 then builds upon this definition by specifying that it "includes" certain individuals who act on behalf of a corporation or partnership -- i.e., "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

This harmonizing construction of § 7701(a)(1) and § 7343 also satisfies the specific dictate of the Internal Revenue Code that "[t]he term[] 'includes' . . . when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined." It would violate this code-mandated rule of statutory construction to conclude, as Defendant proposes, that the use of the word "includes" in § 7343 operates to exclude the *entirety* of the general definition of "person" set forth at § 7701(a)(1) -- i.e., individuals, trusts, estates, partnerships, associations, companies, and corporations -- and to wholly supplant this definition with a far more limited class consisting only of corporate officers and employees and members and employees of partnerships. * * * Thus, it is not only far more natural, but also better comports with § 7701(c), to construe § 7343 as building upon, and not overriding, the more general and broadly applicable definition of "person" found at § 7701(a)(1).

Not surprisingly, then, the courts have uniformly rejected the reading of "person" advocated by Defendant here. * * *[25]

In addition to this criminal conviction that is explicitly linked to the

positions outlined in Cracking the Code, Mr. Hendrickson has been enjoined from

---

[25]Hendrickson, 664 F. Supp. 2d at 814-815 (citations omitted).

**[*39]** "filing any tax return, amended return, form * * * or other writing or paper with the IRS that is based on the false and frivolous claims set forth in <u>Cracking the Code</u> that only federal, state or local government workers are liable for the payment of federal income tax or subject to the withholding of federal income, social security and Medicare taxes from their wages".[26]

The reporting positions that gave rise to the permanent injunction, as well as Mr. Hendrickson's second indictment and conviction, bear a striking resemblance to Mr. Waltner's reporting positions that gave rise to his frivolous tax submissions penalty and that he espoused in his pleadings in this case. Both failed to report their wages but rather submitted with their tax returns substitute W-2s that reported that they received no wages. On brief Mr. Hendrickson explained that someone "working for remuneration in the private sector, as opposed to an individual who earned remuneration as a result of the voluntary exercise of a federal privilege, was not an 'employee' and the remuneration he earned was not 'wages'".[27] Likewise, in his responses to respondent's requests for admissions, Mr. Waltner states that while he "does not deny having worked for private

---

[26]<u>United States v. Hendrickson</u>, No. 06-11753 (E.D. Mich. May 2, 2007) (Amended Judgment and Order of Permanent Injunction).

[27]<u>Hendrickson</u>, 664 F. Supp. 2d at 796.

[*40] companies, or having been paid money for that work in 2008, [he] denies that this work included the performance of taxable activities or resulted in receipts or gains therefrom that are subject to tax without apportionment."

Through the Looking Glass

Fittingly, Cracking the Code begins with a passage from Lewis Carroll's Through the Looking Glass (1872). In chapter 6 of Carroll's classic, Alice encounters Humpty Dumpty where one would expect him to be--sitting on a wall. Humpty is an odd egg, filled with self-importance. He is pedantic. (Humpty asks "And if you take one from three hundred and sixty-five, what remains?" To which Alice responds "Three hundred and sixty-four, of course." "Humpty Dumpty looked doubtful. 'I'd rather see that done on paper,' he said.") And when Humpty speaks, he makes little sense. When Alice is confused by what he says, she tells Humpty that she does not know what he means. "'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean--neither more nor less.'"

It is this passage that is quoted at the beginning of Cracking the Code. It is fitting because the book is largely an exercise in twisting the meaning of words into what the author wants them to mean, even if statutes, regulations, and case law define those words otherwise.

**[*41]** <u>Foreword</u>

If there is a single truth in Cracking the Code, it can be found in ALL CAPS in the forward:  If you have taxable income, you are subject to the income tax.[28] This is known as a tautology; it is a statement that merely repeats itself.  It says that taxable income is taxable.

As if to draw a contrast, the book then cites <u>S. Pac. Co. v. Lowe</u>, 247 U.S. 330 (1918), for another unremarkable proposition:  Not everything that one receives is taxable income.  When considering citing a case, a "researcher, analyst and scholar" might look to see whether the "case turns upon its very peculiar facts".  (It does. <u>Id.</u> at 338.)  A "researcher, analyst and scholar" might look to see whether the law that the case is interpreting is the same law that is currently in effect.  (It is not.  The case interpreted the Income Tax Act of 1913; we currently operate under the Internal Revenue Code of 1986, as amended.)  A "researcher, analyst and scholar" might look to see whether the case has been distinguished or criticized.  (It has, repeatedly.  <u>See, e.g.</u>, <u>Nat'l Carbide Corp. v. Commissioner</u>, 336 U.S. 422, 429 (1949).)  A "researcher, analyst and scholar" might look to see whether the analysis in the case has been "repudiated by subsequent decisions" of the very same court.  (It has.  <u>Id.</u>)

---

[28]Cracking the Code, <u>supra</u> note 16, at i.

**[\*42]** But one need not research the few citations that appear in the book to see what Cracking the Code really is: an antitax screed, short on substance and long on invective. The foreword is clear in this regard, stating: "Plainly stated, the 'income' tax scheme is an utterly corrupt and corrosive fraud feeding an ever-more insatiable appetite of a swollen cadre of politically astute private interests and their camp-followers by way of a deliberate campaign of disinformation, intimidation and cunning."[29] The foreword refers to the tax laws variously as "widely misunderstood" and "dauntingly and profoundly confusing", administered by "a professional class of fixers and go-betweens" through a "tangle of deceit and confusion".[30] This is not analysis.

Introduction

The introduction to Cracking the Code chronicles the author's antitax journey. Without an explicit reference to his 1991 indictment, the author refers to "a rogue and ignorant judge" who, in 1992, apparently ordered him to "comply

---

[29]Throughout the book, Mr. Hendrickson uses scare quotes, especially around the words "income" and "wages". Scare quotes are defined as "[e]ither of a pair of quotation marks used to emphasize a word or phrase or to indicate its special status, especially to express doubt about its validity or to criticize its use." The American Heritage Dictionary of the English Language 1555 (4th ed. 2000).

[30]Cracking the Code, supra note 16, at iii.

[*43] with all internal revenue laws".[31]  He questions "the lawfulness[] of the U.S. Supreme Court" and names as his apparent inspiration people like Irwin Schiff, a well-recognized tax protester who resides in a Federal prison as a result of his conviction for conspiracy, aiding in the filing of false income tax returns, and failing to pay income tax (plus added time for contempt).[32]  The author tells of how he would alter the jurat on his tax return, but he notes that the IRS eventually refused to accept his returns with the altered jurat.[33]  Although he seems to attach meaning to the fact that the IRS often accepted his returns with the altered jurat, as the Supreme Court recently noted, "An agency's failure to assert a power, even if prolonged, cannot alter the plain meaning of a statute."[34]  It should come as no surprise that the IRS eventually rejected the returns with the altered jurat; returns

---

[31]Cracking the Code, supra note 16, at viii.

[32]United States v. Schiff, ___ Fed. Appx. ___, 2013 U.S. App. LEXIS 22636 (9th Cir. Nov. 7, 2013).

[33]Cracking the Code, supra note 16, at ix.

[34]United States v. Woods, 571 U.S. ___, ___, 134 S. Ct. 557, 567 n.5 (2013).

[*44] must be executed under penalties of perjury.[35]  And an altered jurat may be enough to invalidate a return.[36]

Part I

Cracking the Code is divided into three major parts with each part containing several sections.  Part I is titled "The Nature Of The Law" and states-- or more accurately, misstates--a variety of principles.  The following are the section headings from Part I.

"About Taxes--Direct v. Indirect"

Starting with the premise that taxes are either direct or indirect, Cracking the Code lays the foundation for the remainder of the book on two fallacies.  The first is that "federal direct taxes which affect citizens of the several states must be apportioned."[37]  The Constitution at one time required this apportionment; however, with the adoption of the 16th Amendment in 1913, this rule no longer

---

[35]Sec. 6065.

[36]See, e.g., Sloan v. Commissioner, 53 F.3d 799 (7th Cir. 1995), aff'g 102 T.C. 137 (1994); see also Williams v. Commissioner, 114 T.C. 136 (2000).

[37]Cracking the Code, supra note 16, at 2.

**[\*45]** applies to income taxes.[38]  It is unclear whether the author accepts this fundamental point.

The second fallacy is that the Federal Government has legislative authority over only the District of Columbia and U.S. territories and thus lacks the authority to impose taxes within any State.  The error here starts with the author's misreading of the Constitution.  The Constitution gives Congress the power

> To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings ✳ ✳ ✳ [39]

---

[38]Eisner v. Macomber, 252 U.S. 189, 218-219 (1920); see also Brushaber v. Union Pac. R.R. Co., 240 U.S. 1, 18 (1916).  Brushaber merits special mention, because Cracking the Code misleadingly cites that case.  A stockholder brought suit to against a corporation to prevent the corporation from paying taxes imposed by the Tariff Act of 1913.  The Supreme Court summarized the stockholder's arguments, stating:  "The various propositions are so intermingled as to cause it to be difficult to classify them." Brushaber, 240 U.S. at 10.  The Supreme Court then proceeded to untangle the stockholder's arguments, which ultimately proved to be losing arguments.  Yet Cracking the Code cites the Supreme Court's summary of the losing arguments as though it were the Supreme Court's analysis of the underlying constitutional issues.  Cracking the Code, supra note 16, at 19-20.

[39]U.S. Const., art. I, sec. 8.

[*46] From this the author leaps to the erroneous conclusion that "All other areas within the union are under the exclusive jurisdiction of one of the several States, and are thus insulated from federal authority except in regard to certain enumerated powers, and federal governmental property and contract rights."[40]  The fact that Congress has exclusive legislative power in one area does not mean that it has no legislative power in others; it merely means that its power in those other areas is not exclusive.  States and the Federal Government exercise sovereignty concurrent with one another.  Or, as the Supreme Court has stated:  "As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government."[41]

---

[40]Cracking the Code, supra note 16, at 6.

[41]Gregory v. Ashcroft, 501 U.S. 452, 457 (1991); see also Loughborough v. Blake, 18 U.S. 317, 319 (1820) ("The power, then, to lay and collect duties, imposts and excises may be exercised, and must be exercised, throughout the United States.  Does this term designate the whole, or any particular portion of the American empire? Certainly, this question can admit of but one answer.  It is the name given to our great republic, which is composed of states and territories.  The district of Columbia, or the territory west of the Missouri, is not less within the United States, than Maryland or Pennsylvania; and it is not less necessary, on the principles of our constitution, that uniformity in the imposition of imposts, duties and excises should be observed in the one, than in the other.").

**[*47]** "The Origin Of The 'Income' Tax"

The author attempts to use early enactments of the income tax to shed light on the meaning of the income tax as it exists, but he fails miserably. Section 86 of the Revenue Act of 1862, ch. 119, 12 Stat. at 472, imposed a 3% tax on Federal employees whereas section 90, 12 Stat. at 473, of the same act imposed a 3% tax on "every person residing in the United States". The author makes an unfounded leap to conclude that by "identification in section 86 of the remuneration (pay) of government workers as taxable--and taxed--this original enactment provides a rare, forthright statutory acknowledgement that the remuneration of private-sectors workers is not."[42] It does not acknowledge any such thing. These are separate provisions under separate headings of the Revenue Act of 1862. More fundamentally, however, these are not the provisions that impose the current income tax.

A similar problem adheres to the author's discussion of Pollock v. Farmers' Loan & Trust Co., 158 U.S. 601 (1895). The case addressed the question of direct versus indirect taxes and the (then-existing) requirement that all direct taxes be apportioned. Again, the apportionment issue was resolved by the 16th

---

[42]Cracking the Code, supra note 16, at 14.

**[\*48]** Amendment, which was proposed and ratified after <u>Pollock</u>.[43]  The author's

failure to recognize this simple point renders the rest of his discussion

meaningless.

"The Supreme Court And The Meaning of 'Income'"

The author's tortured analysis erroneously concludes that remuneration for

work is not profit and thus is not taxable.  This proposition has already been

rejected by the courts.[44]  Although we need not review the issue further, the

author's illogic is worth noting.  The analysis begins with a simple analogy of a

shepherd exchanging a sheep for shoes from a cobbler.  The author asks whether

in such a transaction either party received income, concluding "[c]learly not".[45]

This may not be income in the author's mind, but from a tax standpoint, it is

income from a barter transaction and it is subject to tax.[46]  The rest of the author's

conclusions that flow from this analogy all fail because of his faulty premise.

---

[43]<u>Brushaber</u>, 240 U.S. at 18 ("[T]here is no escape from the conclusion that
the Amendment was drawn for the purpose of doing away for the future with the
principle upon which the <u>Pollock</u> case was decided[.]").

[44]<u>See, e.g.</u>, <u>Reading v. Commissioner</u>, 70 T.C. 730 (1978), <u>aff'd</u>, 614 F.2d
159 (8th Cir. 1980).

[45]<u>Cracking the Code</u>, <u>supra</u> note 16, at 26.

[46]Sec. 61(a); <u>Baker v. Commissioner</u>, 88 T.C. 1282, 1288 (1987); <u>Rooney v.
Commissioner</u>, 88 T.C 523 (1987); sec. 1.61-2(d)(1), Income Tax Regs.

**[*49]** <u>"Regarding The Law And Its Virtues"</u>

The author opines that laws that need the assistance of interpretation are "improper and void" and goes on to suggest that the judiciary lacks the authority to interpret the law.[47]  Nonsense.  It was Chief Justice John Marshall who wrote more than two centuries ago:  "It is emphatically the province and duty of the judicial department to say what the law is.  Those who apply the rule to particular cases, must of necessity expound and interpret that rule."[48]

<u>"The Plot Thickens"</u>

Amongst the errors in this section is the author's misapprehension of the meaning of the word "including", or perhaps more accurately his ignoring it.  For example, because certain out-of-date tax provisions expressly stated that they taxed income, including that of Federal employees, the author erroneously concludes that persons who are not Federal employees are not taxed.  The Supreme Court rejected this view half a century ago.

> Though the definition of "person" in § 6332 does not mention States or any sovereign or political entity or their officers among those it "includes" * * * it does not <u>exclude</u> them.  This is made certain by the provisions of § 7701(b) of the 1954 Internal Revenue Code that "The terms 'includes' and 'including' when used in a definition contained

---

[47]Cracking the Code, <u>supra</u> note 16, at 38.

[48]<u>Marbury v. Madison</u>, 5 U.S. 137, 177 (1803).

**[*50]** in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined." * * * [49]

The error flows from the author's failure to comprehend the meaning of the word "including", an error that appears repeatedly in the book and that Mr. Waltner perpetuated.

When the law uses a general term followed by the word "including", what follows is a nonexhaustive list.[50] The Internal Revenue Code is explicit in this regard, providing that "includes" and "including" "shall not be deemed to exclude other things".[51] In contrast, when the law uses a specific list of terms, that list is presumed to be exhaustive.[52] This principle is often referred to by the Latin phrase "expressio unius est exclusio alterius".[53]

---

[49]Sims v. United States, 359 U.S. 108, 112 (1959).

[50]Wnuck, 136 T.C. at 506 ("Anyone fluent in English knows that the word 'includes' cannot be assumed to mean 'includes only'.").

[51]Sec. 7701(c).

[52]Helvering v. Morgan's, Inc., 293 U.S. 121, 125 n.1 (1934) ("The terms 'means' and 'includes' are not necessarily synonymous. * * * The natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are those specified in the definition.").

[53]Black's Law Dictionary 661-662 (9th ed. 2009).

[*51] This can be illustrated by a simple example. If one were to say "I had ham and eggs for breakfast", it would mean that the person had just that. If, however, one were to say "I had breakfast, including ham and eggs", then that breakfast may well have included toast or other breakfast foods. In short, "including" is not a word of limitation.

Mr. Waltner followed the same erroneous reading of the word "including" when he argued that he is not a person. We addressed this error in an order dated September 3, 2013, stating:

> Mr. Waltner asserts that he is not a "person" as defined in section 6671(b); an argument that has already [been] rejected by this Court and the court of appeals to which this case is appealable. See Crites v. Commissioner, T.C. Memo. 2012-267 at *7-8 and United States v. Graham, 309 F.2d 210, 212 (9th Cir.1962). Under section 6671(b), a "person" subject to section 6702 penalties "includes an officer or employee of a corporation, or a member or employee of a partnership." The definition of "person" includes officers and employees, but does not exclude all others. In case the plain meaning of the word "includes" was not sufficiently clear, the Code explicitly tells us that "The terms 'includes' and 'including' when used in a definition contained in this title shall **_not_** be deemed to exclude other things otherwise within the meaning of the term defined." Sec. 7701(c) (emphasis added). * * *

This is the same order in which we cautioned Mr. Waltner against making frivolous arguments.

**[\*52]** "The Law Means What It Says"

Having spent the immediately preceding chapter misinterpreting the word

"including", the author turns to the same Latin phrase discussed above and then

proceeds to misinterpret it.  Indeed, courts have repeatedly explained that phrase,

and the author's views simply do not withstand scrutiny.[54]  The faulty conclusions

that the author reaches are laughable and have been rejected elsewhere:

- Because one Code section defines the term "employee" to include government employees,[55] someone who does not work for the government is not included in the definition of an employee.  This proposition was rejected in United States v. Latham, 754 F.2d 747, 750 (7th Cir. 1985).

- Because one Code section defines the United States to include the U.S. territories,[56] the fifty States are not included in the definition of United States.  This proposition was rejected in Wnuck v. Commissioner, 136 T.C. 498, 504 (2011).

"The Code Is Born"

This chapter provides an example of how one illogical conclusion can be

used to bolster another.  The author makes the unsupported statement that

"[n]eedless to say, the federal government has no authority to subject officers and

---

[54]See Rand v. Commissioner, 141 T.C. ___, ___ (slip. op. at 20) (Nov. 18, 2013).

[55]Sec. 3401(c).

[56]Sec. 3121(e)(2).

**[*53]** employees of the several union States to taxation by decree."[57] He cites no support, and this view has already been rejected by the Supreme Court.[58] But he bolsters this erroneous view on the basis of his continued misunderstanding of the word "including." Because section 7701(a)(10) provides that "[t]he term "State" shall be construed to include the District of Columbia", the author implies the term "State" does not include the 50 States. More than 75 years ago, the Supreme Court made clear that the Federal government can tax State employees.[59]

"Withholding The Truth"

Turning to the subject of withholding, the author sets forth one of his fundamental, and fundamentally incorrect, positions regarding tax reporting.

---

[57]Cracking the Code, supra note 16, at 70.

[58]Sims, 359 U.S. at 112-113 (holding a State auditor personally liable for failing to honor levies on the salaries of certain State employees for the payment of Federal taxes).

[59]Helvering v. Gerhardt, 304 U.S. 405, 416-417 (1938) ("In a complex economic society tax burdens laid upon those who directly or indirectly have dealings with the states, tend, to some extent not capable of precise measurement, to be passed on economically and thus to burden the state government itself. But if every federal tax which is laid on some new form of state activity, or whose economic burden reaches in some measure the state or those who serve it, were to be set aside as an infringement of state sovereignty, it is evident that a restriction upon national power, devised only as a shield to protect the states from curtailment of the essential operations of government which they have exercised from the beginning, would become a ready means for striking down the taxing power of the nation.").

**[\*54]** Having erroneously concluded that the term "employee" includes only government employees (and a few selected others), the author concludes that "this kind of withholding only applies to the pay of federal government workers".[60] This argument, too, has already been rejected by the courts, with at least one court characterizing it as "a preposterous reading of the statute."[61]

> "Crafting A Trade Or Business Plan:  A Guide For The Self-Employed"

The author's misinterpretation of the word "includes" continues to lead him to erroneous conclusions.  For people involved in a trade or business, he concludes "that unless one's works involves the performance of the functions of a public office one has no 'net earnings from self-employment' and need file no return regarding the proceeds of self-employment; and no private-sector person or company should ever issue a 1099 MISC."[62]  We see this view mirrored in Mr. Waltner's repeated reference to himself as a "private-sector worker" as a reason he should not be taxed.  As we have already noted, private sector workers are indeed

---

[60]Cracking the Code, <u>supra</u> note 16, at 76.

[61]<u>United States v. Latham</u>, 754 F.2d 747, 750 (7th Cir. 1985).

[62]Cracking the Code, <u>supra</u> note 16, at 87.

[*55] included among the class of people who are subject to tax.[63] And this very argument has previously led to sanctions.[64]

Interlude

In a pernicious attempt at persuasion, Hendrickson interrupts his own book to make certain that the reader is convinced. He presents, in essence, a false dichotomy: Either you agree with him or "you personally are simply incapable of understanding the law".[65] And anyone who disagrees is part of "a conspiracy of sloth, and ignorance, and plunder, and fear. And a good share of corruption and lies, of course."[66] Or he is simply wrong, but the reader is not offered this option.

Part II

Part II of Cracking the Code is titled "The Nature Of The Scheme", which is apt because it is in Part II where the author lays out his scheme for how people can avoid taxes. His erroneous advice regarding tax reporting mirrors how Mr. Waltner has reported, or attempted to report, his items.

---

[63]Latham, 754 F.2d at 750.

[64]See, e.g., Pabon v. Commissioner, T.C. Memo. 1994-476.

[65]Cracking the Code, supra note 16, at 92.

[66]Cracking the Code, supra note 16, at 95.

**[\*56]** "'W' Is For Weapon"

The author's chief weapon, as described beginning in this chapter and continuing in subsequent chapters, is not to comply with the tax laws. He begins with a fundamental misunderstanding of what it means to have a "voluntary compliance" tax system. As we have noted previously, "The concept of voluntary compliance does not refer to whether one volunteers to be liable for tax but only that one voluntarily reports and remits his tax due. In the absence of such voluntary compliance, the government may force compliance."[67] For example, failing to file a return can result in civil and criminal penalties.[68]

We have previously addressed the argument that phrase "voluntary compliance" means that the tax system is voluntary, stating:

> This is nothing but arrogant sophistry. Implicit in the statements relied upon by him to the effect that the system is based upon voluntary compliance is the known fact that, in spite of its extensive bureaucracy and technical equipment, the manpower and facilities of the IRS for policing compliance by every taxpayer are limited and that the effectiveness of the system depends upon the taxpayer's voluntary obedience to the law. These statements certainly were never intended to suggest that the internal revenue laws were self-destructive. Yet, this is precisely what petitioner's argument

---

[67]McKeown v. Commissioner, T.C. Memo. 1985-74.

[68]See, e.g., sec. 6651(a)(1) (imposing a civil addition to tax for failure to file); sec. 7203 (imposing a criminal fine or imprisonment for willful failure to file).

**[\*57]** comes down to, for if he were correct, Congress has supplied every taxpayer with a facile device for totally avoiding all liability by simply declaring that he does not choose to comply.  We cannot find that Congress ever intended any such absurd result.[69]

The result would be absurd, and the very argument is absurd.  Yet this absurd argument serves as the foundation for the author's suggestions in the succeeding chapters.

"W-9's And Other Alien Notions"

On the basis of his misguided views about voluntary compliance and who is subject to tax, the author takes issue with the Form W-9, Request for Taxpayer Identification Number and Certification, that is typically submitted by people who are required to file certain information returns.  On the basis of his misinterpretation of various words, as discussed above, the author suggests "replacing the relevant line [declaring that you are a U.S. citizen or U.S person] with an accurate declaration, like: 'I am a Pennsylvania citizen' (or whatever is true); and adding language" stating you are not subject to withholding.[70]  Indeed, we see this same type of nonsensical rhetoric from Mr. Waltner.  But the author has it backwards; one cannot be a citizen of a State without also being a citizen of

---

[69]Donelin v. Commissioner, T.C. Memo. 1984-131; see also Wilcox v. Commissioner, 848 F.2d 1007, 1008 (9th Cir. 1988), aff'g T.C. Memo. 1987-225.

[70]Cracking the Code, supra note 16, at 130-131.

**[*58]** the United States.[71]  Indeed, citizenship in the United States is "paramount and dominant" over State citizenship.[72]

"Lies, Damned Lies, And W-2's"

Much like the Humpty Dumpty passage at the start of Cracking the Code, the author at this point has redefined terms to mean what he wants them to mean: The term "United States" does not include the States, the term "employee" does not include most employees, and the term "person" does not include most people. It is only by venturing into this Through the Looking Glass world that the author can conclude that tax reporting through Forms W-2 and 1099 does not apply to private sector persons, a position echoed repeatedly by Mr. Waltner.

In another pernicious attempt at persuasion, the author issues an ominous warning to the reader.  It is the author's view that only Federal workers are subject to tax.  By accepting a Form W-2 that reports wages, the author suggests that one would be admitting to being a Federal worker.  Thus, he concludes, failing to

---

[71]Kantor v. Wellesley Galleries, Ltd., 704 F.2d 1088, 1090-1091 (9th Cir. 1983) ("Relying on this Supreme Court authority, circuit and district courts have treated the question before us today as one long decided: '[I]n order to be a citizen of a state, it is elementary law that one must first be a citizen of the United States.'" (quoting Factor v. Pennington Press, Inc., 230 F. Supp. 906, 909 (N.D. Ill. 1963)).

[72]Colgate v. Harvey, 296 U.S. 404, 427 (1935), overruled in part on other grounds by Madden v. Commissioner, 309 U.S. 83 (1940).

[*59] correct a Form W-2 to state that one earned zero wages will land the recipient of the Form W-2 in jail: "Furthermore, impersonating a federal official or employee, as in pretending to be engaged in the performance of the functions of a public office and withholding from one's 'employees' accordingly, is a felony under 18 USC 912".[73] Recall, however, that it is Mr. Hendrickson who has been convicted of tax-related felonies.

"W-4s--The Blind Leading The Blind Down A Primrose Path"

Much of the remainder of Cracking the Code simply rehashes the myths that we have dispelled above. In this section the author analogizes the Form W-4, Employee's Withholding Allowance Certificate, to the Form W-2, likewise maintaining that most employees are not employees under his interpretation and thus need not have taxes withheld. But this argument has already been rejected.[74]

"Feeding The Hand That Bites You"

Cracking the Code turns its attention to employers, suggesting that businesses are duped from their inception into participating in the tax system. Here is another instance where we see parallels between Mr. Waltner's conduct and the course of action suggested in Cracking the Code. The author suggests

---

[73]Cracking the Code, supra note 16, at 142-143.

[74]See, e.g., Latham, 754 F.2d at 750.

[*60] "carefully avoiding the use of any possibly misleading legal terms such as 'employee', 'wages', etc.", instead suggesting that forms be left blank or that terms be altered.[75]  This mirrors Mr. Waltner's conduct in this case.  An example can be seen in his application for fee waiver, where he substituted "pay" for "salary or wages" and "job" for "employment".  As already outlined above, both the author's and Mr. Waltner's positions regarding these terms are without merit.

"About 1040's, And Claiming Refunds"

As previously discussed, Cracking the Code erroneously redefines terms in such a way as to nullify the tax system.  And one incorrect definition is predicated on another, as in this section where the author concludes that "the vast majority of adult American citizens are not 'taxpayers', because they are not 'employers', 'withholding agents', recipients of 'income' in more than the exemption amount, or other such specialized entities by virtue of which liability for an internal revenue tax might arise."[76]

This misguided view leads to the author's strategy for filing tax returns, which was mirrored by Mr. Waltner's returns.  The author recommends "correcting" Forms 1099 by including a declaration that nothing that was received

---

[75]Cracking the Code, supra note 16, at 160.

[76]Cracking the Code, supra note 16, at 164.

[*61] was taxable. Mr. Waltner did this. The author recommends creating substitute W-2s by changing only the amount of the reported wages. Mr. Waltner did this. The author recommends filing a Form 1040 based on these inappropriately revised forms. Mr. Waltner did this. The author recommends including FICA taxes amongst the taxes withheld. Mr. Waltner did this.

Part III

Part III, labeled "The Nature of the Crisis", lays bare the author's disdain for our tax system; it is, however, devoid of analysis.

"Why It Matters"

According to the author, the entire tax system is "[a] racket by which 250 million people are conned".[77] At this point it should be clear that the only people being conned are those who follow the positions advocated in Cracking the Code. And even if deceptive, the positions outlined above are so lacking in merit that they are sanctionable even if sincerely believed.[78]

---

[77]Cracking the Code, supra note 16, at 187.

[78]Hansen v. Commissioner, 820 F.2d 1464, 1470 (9th Cir. 1987) (holding that a sec. 6673 penalty can apply when the taxpayer should have known that a position was frivolous).

**[\*62]** "Finale"

In misleading its readers into believing that they can avoid taxes because the

law simply does not apply, Cracking the Code provides a warning:

> All that each of us need do is invoke the written law and claim the
> return of money improperly withheld; de-authorize improper
> withholdings for the future; rebut any erroneous assertions by others
> who have paid us; correct any improper assertions that we have made
> ourselves * * * while being ready to abide the storm of protest,
> denial, resistance, threats, intimidation and perhaps injustice which
> might follow.[79]

What the author perceives as injustice is quite the opposite. It is justice. It is the

rule of law as embodied in the duly enacted statutes being interpreted by the

courts.

The positions advocated in Cracking the Code have routinely been rejected,

with its author being criminally convicted and its adherents being sanctioned.[80]

Conclusion

Mr. Waltner took a series of frivolous positions that have repeatedly been

rejected by the courts. Even after this Court cautioned him that he was making

frivolous arguments, he continued to advance them, and his conduct merits

---

[79]Cracking the Code, supra note 16, at 204.

[80]See, e.g., Lindberg v. Commissioner, T.C. Memo. 2010-67 (imposing
sanctions under sec. 6673 for taking positions consistent with those set forth in
Cracking the Code).

[*63] sanctions. The Court is authorized to impose sanctions of up to $25,000. In the hope that Mr. Waltner heeds this warning, the Court imposes a penalty under section 6673 of $2,500. Mr. Waltner has other matters pending in this Court in which he is asserting arguments similar to those presented in this case, and he has now been cautioned in both an order and this opinion. We hope that he will heed the warning. And future litigants are on notice that the positions advanced in Cracking the Code are frivolous and relying on those positions may result in sanctions.

To reflect the foregoing,

An appropriate order and decision will be entered.